[No. S153852. Nov. 18, 2010.]

AMERON INTERNATIONAL CORPORATION, Plaintiff and Appellant, v. INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA et al., Defendants and Respondents.
AMERON INTERNATIONAL CORPORATION, Plaintiff and Appellant, v. HARBOR INSURANCE COMPANY, Defendant and Respondent.

1372

**COUNSEL**

Stanzler Funderburk & Castellon, Stanzler Law Group and Jordan S. Stanzler for Plaintiff and Appellant.

Weston, Benshoof, Rochefort, Rubalcava & MacCuish and Richard Giller for California Cast Metals Association as Amicus Curiae on behalf of Plaintiff and Appellant.

McCurdy & Fuller, Kevin G. McCurdy and Rosemary J. Springer for Defendant and Respondent Insurance Company of the State of Pennsylvania.

Hinshaw & Culbertson, Robert J. Romero, Paul E. Vallone and Joseph J. De Hope, Jr., for Defendants and Respondents Century Indemnity Company, Insurance Company of North America, Pacific Employers Insurance Company, St. Paul Surplus Lines Insurance Company, Insurance Company of the State of Pennsylvania, Harbor Insurance Company and Transcontinental Insurance Company.

Charlston, Revich & Chamberlin, Charlston, Revich & Wollitz, Ira Revich and Nicholas R. Andrea for Defendants and Respondents International Insurance Company and Puritan Insurance Company.

Burnham Brown, Thomas M. Downey, Tyler G. Olpin and James Y. Higa for Defendants and Respondents Transcontinental Insurance Company and Harbor Insurance Company.

Ericksen, Arbuthnot, Kilduff, Day & Lindstrom and Andrew P. Sclar for Defendant and Respondent Old Republic Insurance Company.

Hogan & Hartson, David R. Singer, Jonathan S. Franklin, William J. Bowman and Catherine E. Stetson for Defendant and Respondent Twin City Fire Insurance Company.

Sonnenschein Nath & Rosenthal, Michael A. Barnes, Sonia Martin and Lee L. Kaster for Defendant and Respondent Great American Surplus Lines Insurance Company.

O'Melveny & Myers, Richard B. Goetz and A. Patricia Klemic for Defendants and Respondents Insurance Company of North America and Pacific Employers Insurance Company.

Foley & Lardner, Eileen R. Ridley and Patrick T. Wong for Lloyd's and The Reinsurance Association of America as Amici Curiae on behalf of Defendants and Respondents.

Wiley Rein, Laura A. Foggan; Sinnott, Dito, Moura & Puebla, Randolph P. Sinnott and John J. Moura for Complex Insurance Claims Litigation Association as Amicus Curiae on behalf of Defendants and Respondents.

Sinnott, Dito, Moura & Puebla, Blaise S. Curet and Stephen R. Wong for Zurich American Insurance Company as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

**CHIN, J.**—This court has defined the term "suit" in a comprehensive general liability (CGL) insurance policy as "a court proceeding initiated by the filing of a complaint." (*Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857, 887 [77 Cal.Rptr.2d 107, 959 P.2d 265] (*Foster-Gardner*).) *Foster-Gardner* declined to include an environmental agency's pollution remediation order in that definition, and so we found the insured business was not entitled to coverage under its CGL policy for its cleanup liability. (*Id.* at pp. 860–861, 864.) Here, in a case involving numerous primary, excess, and umbrella insurance policies, we must decide the narrow question: Is a federal administrative adjudicative proceeding before an administrative law judge of

the former United States Department of Interior Board of Contract Appeals (IBCA),[1] which involved 22 days of trial, numerous witnesses, and substantial evidence, a "suit" for purposes of the duty to defend and potential insurance coverage under those policies that do not define the term "suit." This quasi-judicial adjudicative proceeding, employed to resolve government demands against insured parties, is a "suit" as a reasonable insured would understand that term. We therefore conclude that *Foster-Gardner*'s rule does not apply here and reverse the Court of Appeal's judgment to the extent it held otherwise.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant Ameron International Corporation (Ameron) is based in Pasadena, California, and incorporated under the laws of the State of Delaware. Respondent insurers (respondents) are 11 insurance companies that provided Ameron with primary CGL coverage as well as excess/umbrella policies between 1978 and 1995.[2] Beginning in 1975, the United States Department of the Interior, Bureau of Reclamation (Bureau) contracted with Peter Kiewit Sons' Company (Kiewit) for the fabrication and installation of concrete siphons used in the Bureau's Central Arizona Project aqueduct. Kiewit then subcontracted manufacture of the siphons to Ameron, requiring it to defend and indemnify Kiewit in the event the siphons proved defective. Kiewit is an insured under Ameron's insurance policies.

In 1990, the Bureau discovered defects in the siphons that required their replacement at a cost of approximately $116 million. In 1992, the Central Arizona Water Conservation District filed an action against Ameron in federal district court in Arizona for its responsibility in providing the defective siphons. Ameron provided respondents with timely notice of that action,

---

[1] In 2007, after the IBCA proceedings here, that department was terminated and consolidated with other agency boards to form the United States Interior Civilian Board of Contract Appeals, established effective January 6, 2007. The consolidation did not affect the applicable regulations at issue in this case, and the parties do not argue that it did.

[2] The respondents are: Insurance Company of the State of Pennsylvania (ICSOP), Century Indemnity Company (as successor to CCI Insurance Company, as successor to Insurance Company of North America) (INA), Pacific Employers Insurance Company (Pacific), St. Paul Surplus Lines Insurance Company (St. Paul), International Insurance Company (International), Puritan Insurance Company (Puritan), Transcontinental Insurance Company (Transcontinental), Old Republic Insurance Company (Old Republic), Twin City Fire Insurance Company (Twin City), Great American Surplus Lines Insurance Company (Great American), and Harbor Insurance Company (Harbor).

With the exception of Harbor, all respondents appear in case No. A109755. Harbor appears in case No. A112856. On our own motion and by an order separately filed, we have consolidated the two appeals.

which was eventually dismissed. An appeal in the Ninth Circuit Court of Appeals also was dismissed, and is not a subject of the present coverage action.

In 1995, the Bureau's contracting officer issued two final decisions finding Kiewit responsible for the siphons' defects and seeking almost $40 million in damages from Kiewit and Ameron.[3] Under the terms of their indemnity agreement providing for a private contractual remedy, Kiewit and Ameron challenged the contracting officer's decision before the IBCA. In light of the Bureau's action against them, Ameron provided timely notice to respondent insurers.

The IBCA administrative law proceeding lasted 22 days and concluded when Ameron and Kiewit settled the Bureau's claims against them for $10 million. Following the settlement, Truck Insurance Exchange, "one of Ameron's primary insurers, paid Ameron certain sums with respect to the [Central Arizona Project] litigation."[4] In addition, INA offered to pay $750,000 towards the settlement, but Ameron rejected this amount as insufficient. The remaining respondents generally failed or refused to pay for the cost of defending or indemnifying Ameron in the litigation before the IBCA.

Ameron, in its own right and as the assignee of Kiewit's rights, filed its operative complaint against respondent insurers on July 21, 2004, alleging causes of action for breach of contract, breach of the covenant of good faith and fair dealing, declaratory relief, waiver and estoppel, and contribution.[5] Ameron's complaint alleged that the IBCA proceedings are "civil proceedings" in which the IBCA acts in a "judicial capacity" when conducting hearings and deciding contested factual issues. Ameron pointed out that under the Contract Disputes Act of 1978 (Contract Disputes Act) (41 U.S.C. § 601 et seq.), it could have chosen to challenge the decision of the Bureau's contracting officer either by appealing that decision to the IBCA, or by bringing an action in the United States Court of Federal Claims (Federal Claims Court). (41 U.S.C. §§ 606, 609.) Ameron contended that the Contract

---

[3] Ameron argues that it paid for and prosecuted the IBCA proceeding in Kiewit's name. In the case at bar, Ameron seeks insurance coverage for itself and on behalf of Kiewit. Kiewit is not a party to this appeal.

[4] The Court of Appeal noted, "Whether Truck compensated Ameron for its defense costs and/or for the settlement it paid is unclear from the face of the complaint . . . . Truck . . . is . . . [not] a party to this appeal."

[5] As all courts involved in the case and Ameron observe, Ameron is the assignee of Kiewit's rights under the 11 insurance policies involved in the present litigation. As the assignee, Ameron assumed all Kiewit's rights under the policies. In addition, Ameron was the real party in interest in the trial before the IBCA. It was also Ameron that paid attorney fees to defend the government's claims in its own name and paid the premiums on the policies sold to it. Based on these facts and the assignment here, Ameron is the proper party before the court.

Disputes Act refers to an action filed in either the IBCA or the Federal Claims Court as a "suit," thus triggering respondents' coverage duties. Ameron asserted that respondents failed or refused to defend or settle the Bureau's claims against it before the IBCA, failed to indemnify it for the IBCA settlement, and neglected to investigate the potential for coverage. The superior court granted respondents' demurrer and dismissed Ameron's complaint. The trial court relied on *Foster-Gardner, supra,* 18 Cal.4th 857, which held that an environmental agency's order identifying the insured as a party responsible for remediating environmental pollution was not a "suit" that would trigger an insurer's duty to defend its insured or provide insurance coverage. (*Id.* at pp. 860–861.)

The Court of Appeal partially reversed the trial court's judgment with respect to those policies that defined a "suit" as a "civil proceeding."[6] However, after commenting that it was reluctantly applying *Foster-Gardner*'s reasoning to those policies that did not define the term "suit," the Court of Appeal concluded that similar pre-1986 insurance policies containing language virtually identical to the policies at issue in *Foster-Gardner*[7] gave Ameron no defense or liability coverage, because the IBCA adjudicative administrative hearing was before a federal administrative agency and not a court of law. We granted review to decide whether, under the applicable Ameron policies at issue here, the rule announced in *Foster-Gardner* applies to preclude the obligation to provide a defense and potential indemnity coverage in an administrative law proceeding before the IBCA.[8]

## DISCUSSION

### A. *Background*

#### 1. *Standard of Review and Insurance Law Principles*

In general, interpretation of an insurance policy is a question of law and is reviewed de novo under settled rules of contract interpretation. (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470 [9

---

[6] These included three of the four policies from INA, as well as policies issued by International, Twin City, St. Paul, and Harbor, and two excess/umbrella policies that ICSOP issued successively from 1990 to 1992.

[7] These included policies from Transcontinental, Puritan, Old Republic, Pacific, and Great American, and an excess/umbrella policy ICSOP issued from 1992 to 1995.

[8] Respondents INA and Pacific seek judicial notice of Foster-Gardner's petition for rehearing filed with this court on August 18, 1998, following our opinion in *Foster-Gardner, supra,* 18 Cal.4th 857. Respondents contend that the arguments made in Ameron's opening brief are similar to the arguments made in the petition for rehearing, indicating that this court has already considered "insurance coverage for an adjudicative procedure." We decline to take notice of a rehearing petition filed over 12 years ago. (Evid. Code, § 459.)

Cal.Rptr.3d 701, 84 P.3d 385] (*E.M.M.I.*); *Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18 [44 Cal.Rptr.2d 370, 900 P.2d 619] (*Waller*).) "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. (Civ. Code, § 1636.) Such intent is to be inferred, if possible, solely from the written provisions of the contract. (*Id.,* § 1639.) The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" (*id.,* § 1644), controls judicial interpretation. (*Id.,* § 1638.)' " (*Waller, supra,* 11 Cal.4th at p. 18.)

■ An insurance policy provision is ambiguous when it is susceptible of two or more reasonable constructions. (*E.M.M.I., supra,* 32 Cal.4th at p. 470.) If ambiguity exists, however, the courts must construe the provisions in the way the insurer believed the insured understood them at the time the policy was purchased. (Civ. Code, § 1649.) In addition, if, after the court evaluates the policy's language and context, ambiguities still exist, the court must construe the ambiguous language against the insurer, who wrote the policy and is held " 'responsible' " for the uncertainty. (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253] (*AIU*).) Particularly, "[i]n the insurance context, . . . ambiguities [are resolved] in favor of coverage" so as to protect the insured's reasonable expectation of coverage. (*Ibid.*; see *La Jolla Beach & Tennis Club, Inc. v. Industrial Indemnity Co.* (1994) 9 Cal.4th 27, 37 [36 Cal.Rptr.2d 100, 884 P.2d 1048].) ■ In addition, to prevail on a duty to defend claim, an insured need " ' "only show that the underlying claim *may* fall within policy coverage . . . ." ' " (*Ortega Rock Quarry v. Golden Eagle Ins. Corp.* (2006) 141 Cal.App.4th 969, 977 [46 Cal.Rptr.3d 517].) Insurers have the more difficult burden of proving that the underlying claim *cannot* fall within policy coverage. (*Ibid.*)

### 2. Foster-Gardner *and Subsequent Cases*

Respondents assert that the hearing before the IBCA was not the trial of a "suit" as defined in the insurance policies. They generally rely on language in *Foster-Gardner* to argue that because the IBCA is not a court of law, any hearing before it is not the trial of a "suit" unless specifically indicated as such in the pertinent policy. (*Foster-Gardner, supra,* 18 Cal.4th at pp. 887–888.) Ameron, in turn, contends that *Foster-Gardner* either does not apply to the IBCA's "civil proceedings," or, if it does, we should overrule it to provide that the IBCA proceedings are considered the trial of a "suit."

In *Foster-Gardner,* the Colorado River Basin Regional Water Quality Control Board and the Riverside County Health Department ordered Foster-Gardner to perform a series of preliminary environmental site investigations at its wholesale pesticide and fertilizer business. (*Foster-Gardner, supra,* 18 Cal.4th at pp. 861–862.) These investigations confirmed pervasive contamination at the site. (*Id.* at p. 862.) California's Department of Toxic Substances Control (DTSC) found that during Foster-Gardner's ownership of the site, it disposed of hazardous substances that impacted groundwater, surface water, soil, and air. (*Ibid.*) The DTSC then issued Foster-Gardner an "Imminent and Substantial Endangerment Order and Remedial Action Order" (Order) that commanded it to remediate the site. (*Id.* at pp. 861–863.)

DTSC issued the Order under the Carpenter-Presley-Tanner Hazardous Substance Account Act (HSAA; Health & Saf. Code, § 25300 et seq.), which is California's version of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA; 42 U.S.C. § 9601 et seq.; *Foster-Gardner, supra,* 18 Cal.4th at p. 861). The Order required Foster-Gardner to continue monitoring contamination at the site, to prepare and submit a remediation plan for DTSC approval, and, after receiving that approval, to implement the plan to remediate the site. (*Foster-Gardner, supra,* at pp. 861–863.)

Foster-Gardner tendered its proposed defense to the Order to four of its insurers, who either refused to defend or agreed to defend subject to a reservation of rights. (*Foster-Gardner, supra,* 18 Cal.4th at pp. 863–864.) All had issued CGL policies containing essentially similar language; none of the policies defined the term "suit" or "claims." (*Ibid.*) Foster-Gardner brought suit against its insurers, asserting they were obligated to defend, and seeking summary adjudication as to their obligation. (*Id.* at p. 864.) However, the trial court disagreed and granted the insurers' cross-motions for summary judgment based on its determination that the Order was not a "suit." (*Ibid.*) The Court of Appeal reversed the judgment, interpreting the policies using a " 'nontechnical . . . analysis' " (*id.* at p. 865) to find the Order was the " 'functional equivalent' " of a "suit" that triggered the insurers' duty to defend (*id.* at p. 879).

Rejecting a "functional" or "hybrid" methodology that other states had adopted in interpreting the meaning of the term "suit" (*Foster-Gardner, supra,* 18 Cal.4th at pp. 871–874), this court reversed the Court of Appeal judgment, holding that the term in the insurance policies at issue referred, unequivocally, to a lawsuit or, more accurately, "a civil action commenced by filing a complaint" (*id.* at p. 878). We cited two authorities: Black's Law Dictionary and Webster's Ninth New Collegiate Dictionary. Black's defines "suit" as " '[a] generic term, of comprehensive signification, referring to any proceeding by one person or persons against another or others in a court of law in

which the plaintiff pursues, in such court, the remedy which the law affords him . . . .' " (*Foster-Gardner, supra,* at p. 879, quoting Black's Law Dict. (6th ed. 1990) p. 1434, col. 1.) Similarly, Webster's defines "suit" as " 'an action or process in a court for the recovery of a right or claim.' " (*Foster-Gardner, supra,* at p. 879, quoting Webster's New Collegiate Dict. (9th ed. 1987) p. 1180.)

██    In considering the coverage issue, we observed that other jurisdictions take different approaches to interpreting CGL policies. Some take a "functional" view, holding that the receipt of any EPA-type cleanup letter or order constitutes a "suit." (See *Aetna Casualty & Surety Co.; Inc. v. Pintlar Corp.* (9th Cir. 1991) 948 F.2d 1507, 1517; *Michigan Millers Mutual Ins. v. Bronson Plating* (1994) 445 Mich. 558 [519 N.W.2d 864, 872].) Other states take a "hybrid" approach, holding that an agency's letter, order, or precomplaint action is a "suit" if it is sufficiently coercive and threatening. (See *Michigan Millers, supra,* 519 N.W.2d at p. 874, fn. 8 (dis. opn. of Griffin, J.) [mere notice of alleged contamination does not trigger coverage under the hybrid test].) *Foster-Gardner* sided with the jurisdictions taking the third, " 'literal meaning,' " approach and held that a "suit" refers to an actual court complaint only. (*Foster-Gardner, supra,* 18 Cal.4th at pp. 869, 879.) This view emphasized that the insurer has undertaken to defend suits, not mere threats " 'to initiate legal action' " (*id.* at p. 882) or a " 'functional equivalent' " (*id.* at p. 879). *Foster-Gardner* reasoned that the literal meaning approach preserves and underscores the distinction between a "suit" and a "claim," as the insurer is required to defend the former but has the discretion to investigate the latter. (*Id.* at pp. 878, 880.) Under this literal interpretation, and in the absence of a corresponding definition within a CGL policy, *Foster-Gardner* determined that a "suit" is a proceeding brought in a court of law by the filing of a complaint. (*Id.* at p. 878.)

As the Court of Appeal observed, we extended our " 'bright-line rule' " (*Foster-Gardner, supra,* 18 Cal.4th at p. 887) in *Certain Underwriters at Lloyd's of London v. Superior Court* (2001) 24 Cal.4th 945, 960–961 [103 Cal.Rptr.2d 672, 16 P.3d 94] (*Powerine I*), to the insurer's duty to indemnify the insured under the same standard CGL insurance policies. *Powerine I* limited the insurer's duty to indemnify for all sums the insured was " 'legally obligated to pay as damages' " to sums ordered by a court, as opposed to expenses required by an agency's cleanup order. (*Id.* at p. 951.) Like policies in *Foster-Gardner,* the policies in *Powerine I* used the terms "suit" and "damages" but did not define either. Next, in *Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377 [33 Cal.Rptr.3d 562, 118 P.3d 589] (*Powerine II*) we emphasized that the specific language used in the policies is determinative; thus, where the coverage provisions included the word "expenses," as well as "damages," the policy required the insurers to indemnify the insured for cleanup of contaminated sites. (*Id.* at pp. 383, 398–405.)

We also looked to specific policy language in *County of San Diego v. Ace Property & Casualty Ins. Co.* (2005) 37 Cal.4th 406 [33 Cal.Rptr.3d 583, 118 P.3d 607], but reached the opposite conclusion to find no coverage because the "literal insuring language" of the excess/umbrella policies in that case neither referenced nor incorporated the term "expenses." (*Id.* at p. 411.)

In addition, the Court of Appeal considered two appellate decisions applying our authority. (*Lockheed Martin Corp. v. Continental Ins. Co.* (2005) 134 Cal.App.4th 187, 200 [35 Cal.Rptr.3d 799] [concluding that insuring phrase " 'any suit or action' " referred to a court proceeding, and thus there was no coverage for agency cleanup orders]; *CDM Investors v. Travelers Casualty & Surety Co.* (2006) 139 Cal.App.4th 1251, 1263 [43 Cal.Rptr.3d 669] [insurance clause for " 'ultimate net loss' " which the insured was obligated to pay " 'as damages' " (italics omitted) did not provide coverage for environmental response costs incurred pursuant to an administrative order because the " 'as damages' " phrase limited the duty to court proceedings].)

Applying these cases, the Court of Appeal discussed the coverage issues for the multiple types of policies the 11 insurers provided to Ameron over the years. In parts I. through IX. of the opinion, the Court of Appeal found coverage under some insurance policies it likened to that in *Powerine II*, but found no coverage as to other policies more akin to the *Foster-Gardner* and *Powerine I* policies. Of importance here is part I.A. There, the Court of Appeal considered a primary CGL policy issued by INA for the years 1988 to 1989. That policy indemnified Ameron for " 'all sums which [Ameron] shall become legally obligated to pay as damages' " and provided a defense duty for " 'any suit against the Insured seeking damages . . . .' " The insuring provision also stated the insurer " 'may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements.' 'Suit' and 'claim' are not defined in the policy." The Court of Appeal observed that the INA policy language was substantially the same as the *Foster-Gardner* and *Powerine I* policy language. Although the court held that *Foster-Gardner* precluded coverage under that INA policy's definition of "suit," it did so with obvious dissatisfaction. The Court of Appeal observed that Ameron's IBCA action—a quasi-judicial administrative agency board hearing conducted by an administrative law judge—was significantly different from the environmental cleanup orders of *Foster-Gardner* and *Powerine I*. Indeed, the court found "much to commend" in Ameron's contention that the IBCA hearing is a "suit." It also found "compelling" a similar distinction embraced in Justice Spencer's concurring opinion in *Fireman's Fund Ins. Co. v. Superior Court* (1997) 65 Cal.App.4th 1205 [78 Cal.Rptr.2d 418], opining that "merely an *investigative* administrative proceeding seeking a negotiated settlement and a consent decree" "did

not qualify as a suit." (*Id.* at p. 1222 (conc. opn. of Spencer, P. J.).) But "the common, ordinary meaning of 'suit' is broad enough to cover . . . adjudicatory administrative hearings . . . ." (*Ibid.* (conc. opn. of Spencer, P. J.).)

In eventually denying Ameron all coverage under those insurance policies that did not define the term "suit," the Court of Appeal observed that the IBCA proceeding is trial-like in nature, and that *Foster-Gardner*'s concerns of uncertainty are not present where the administrative action is adjudicatory. The court noted that "[t]he IBCA proceeding at issue here was, by any measure, an adjudicative administrative hearing. It was commenced by the filing of a notice and complaint and was presided over by a judge governed by federal evidence rules and charged with setting damages for an alleged contract breach." The court concluded that because the administrative proceedings in *Foster-Gardner* involved a pollution remediation order, it could "fairly regard its broad rule as dicta when applied to the very different administrative proceedings in this case." But the court observed that " ' "[e]ven if properly characterized as dictum, statements of the Supreme Court should be considered persuasive." ' " In sum, the Court of Appeal concluded that although a contractor like Ameron would reasonably expect the IBCA litigation to be considered a "suit" seeking "damages," *Foster-Gardner*'s bright-line rule compelled the court to interpret the word "suit" as used in that policy as limited to a court proceeding.

The Court of Appeal addressed a wide range of insurance policy language and discussed at length the coverage provisions in each of those policies that were applicable to the appeal. Ameron's petition for review, however, focused on the narrow but fundamental question whether an adjudicative administrative action like the IBCA action is a "suit" for purposes of coverage under a liability policy. Ameron asserts that the rule in *Foster-Gardner* and its progeny does not apply to the IBCA action. That action, Ameron claims, is a "suit" even under *Foster-Gardner*'s bright-line rule approach. The specific post-*Foster-Gardner* question—whether a liability policy covers adjudicative administrative hearings like the hearing before the IBCA under policies that do not specifically define "suit" or limit the application of coverage to preclude administrative adjudicative hearings—is one of first impression.

B. *Analysis*

1. *The Obligation to Defend a Suit*

Ameron contends that *Foster-Gardner* is not applicable here because the IBCA proceeding was a "suit" as a reasonable insured would understand the term, in contrast to the pollution remediation order for which the insured sought coverage in *Foster-Gardner*. Ameron points out that the IBCA is a

quasi-judicial administrative agency board, proceedings before which require the filing of notice and a complaint setting forth "simple, concise, and direct statements of each claim." (43 C.F.R. § 4.107(a) (2009).) During hearings before the IBCA, parties may subpoena witnesses and introduce evidence; the IBCA swears in witnesses, and party representatives may cross-examine them; and all evidence is subject to the "generally accepted [federal] rules" of admissibility. In addition, administrative law judges on the IBCA are empowered to grant the same relief that would be available to a litigant asserting a contract claim in the Federal Claims Court. As the United States Supreme Court noted, the role of the administrative law judge within this framework is comparable to that of a trial judge. "[The judge] may issue subpoenas, rule on proffers of evidence, regulate the course of the hearing, and make or recommend decisions." (*Butz v. Economou* (1978) 438 U.S. 478, 513 [57 L.Ed.2d 895, 98 S.Ct. 2894]; see also 5 U.S.C. § 556(c).)

Therefore, in order to determine whether proceedings before the IBCA are a "suit" we must decide if the concerns that led us to conclude that issuance of a pollution remediation order was not a "suit" also apply to hearings before a federal administrative adjudicative body. In conducting this analysis, we compare the IBCA's complaint requirements to those of the Code of Civil Procedure. We also look briefly both to Congress's intent in setting up the IBCA, and to the structure of IBCA proceedings themselves.

### 2. *The IBCA's Complaint Requirements*

■ It is a "settled rule that the insurer must look to the facts of the complaint and extrinsic evidence, if available, to determine whether there is a potential for coverage under the policy and a corresponding duty to defend." (*Waller, supra*, 11 Cal.4th at p. 25.) In *Foster-Gardner*, the court pointed out that "[i]t is because the insurer's duty to defend depends on the allegations in the *complaint* that the insurer may or may not owe a duty to defend those allegations." (*Foster-Gardner, supra*, 18 Cal.4th at p. 880, original italics, citing *Waller, supra*, 11 Cal.4th at p. 26.) This link between the complaint and an insurer's duty to provide coverage was crucial to *Foster-Gardner's* holding that the pollution remediation order, which did not amount to a complaint, provided insurance companies insufficient notice of the parameters of the action against the insured. (*Foster-Gardner, supra*, at p. 880.)

The IBCA complaint requirements distinguish the case from *Foster-Gardner*. As noted, the Contract Disputes Act established the IBCA and authorized it to conduct trials, determine liability, and award money damages. (41 U.S.C. § 607.) The legislative history shows that Congress intended the IBCA to serve as an alternative means to resolve contract disputes in an informal, expeditious, and inexpensive way. (Sen.Rep. No. 95-1118, 2d Sess.,

pp. 1, 12 (1978), reprinted in 1978 U.S. Code Cong. & Admin. News, p. 5235.) As previously noted, Congress created "concurrent jurisdiction" in the United States Court of Claims (now called the United States Court of Federal Claims) and the IBCA to review appeals from contracting officers' decisions. (*Coco Brothers, Inc. v. Pierce* (3d Cir. 1984) 741 F.2d 675, 678; see 41 U.S.C. §§ 606, 609(a)(1).) In other words, Ameron had a choice of forums for appealing the liability decision of the Bureau's contracting officer, and it chose the IBCA.

■ The IBCA procedure at issue here requires the contractor appealing from an adverse decision by the Bureau's contracting officer to file a complaint, "setting forth simple, concise, and direct statements of each claim, alleging the basis with appropriate reference to contract provisions for each claim, and the dollar amount claimed." (43 C.F.R. § 4.107(a) (2009).) The complaint requires "no particular form or formality," and it "shall fulfill the generally recognized requirements of a complaint." (*Ibid.*) Although the contractor thus initiates the IBCA proceeding, the purpose of the proceeding is to resolve the claim against the contractor, who is therefore in the position of a defendant. The factual issues are then framed for adjudication by the pleadings, which consist both of the contractor's complaint and the government's answer. Together, these pleadings serve the purpose ascribed to the court complaint as described in *Foster-Gardner,* namely, informing the insurer of the nature of the dispute so that it can determine its defense duties under the insurance policy.

In addition, not only does the Code of Federal Regulations call the required pleading before the IBCA a "complaint," but the requirements for that "complaint" serve the same notice purpose as California's civil litigation complaint requirement. (43 C.F.R. § 4.107(a) (2009).) Under the Code of Civil Procedure, a complaint must contain a "statement of the facts constituting the cause of action, in ordinary and concise language." (Code. Civ. Proc., § 425.10, subd. (a).) This requirement forces parties to give fair notice of their claims to opposing parties so they can defend. (*Doheny Park Terrace Homeowners Assn., Inc. v. Truck Ins. Exchange* (2005) 132 Cal.App.4th 1076, 1099 [34 Cal.Rptr.3d 157].)

It is clear that the IBCA pleading requirements meet the standards for a complaint under our Code of Civil Procedure. The IBCA pleading must "set[] forth simple, concise, and direct statements of each claim, alleging the basis with appropriate reference to contract provisions for each claim . . . ." This level of specificity gives as much, if not more, notice to insurers making coverage decisions regarding claims as does the specificity required by our Code of Civil Procedure. If there were any doubt whether the "complaint" before the IBCA was meant to serve the same purpose as a complaint in a

court of law, the Code of Federal Regulations spells it out for us: "This pleading shall fulfill the generally recognized requirements of a complaint . . . ." (43 C.F.R. § 4.107(a) (2009).) It would exalt form over substance to find such a complaint before the IBCA insufficient simply because the IBCA is not a court of law, particularly when the basis of the insurers' position is that they rely on the substantive contents of a complaint in order to make their coverage decisions.

Respondents rely on the fact that a contractor can choose to access article III courts (U.S. Const., art. III) directly, by filing an action with the Federal Claims Court rather than with the IBCA. (Sen.Rep. No. 95-1118, *supra*, p. 3.) Respondents claim that this alternative procedure means that Congress intended to distinguish an action filed with the IBCA from one filed with the Federal Claims Court. They assert that the "degree of due process desired" is weighed against "the time and expense considered appropriate for the case." In other words, respondents claim that the contractor that chooses the IBCA as a forum must give up some of the due process rights that it would have received in a court, such that the IBCA proceedings stop short of being a "suit." Not so. Congress allowed for these two avenues of review in order to "cut down the present traffic between the boards and the courts . . . [to] reduc[e] the points of friction and eliminat[e] delays." (Sen.Rep. No. 95-1118, *supra*, p. 12.) In addition, Congress expected that agency boards would handle "better than 90 percent of contract claims," "since they should be the least expensive, most expeditious forum available to the contractor." (*Ibid.*) Due process rights are adequately protected in the IBCA quasi-judicial proceedings. (*Id.* at p. 13.) With regard to appeals to the IBCA, Congress states: "The contractor should feel that he is able to obtain his 'day in court' . . . and at the same time [save] time and money through the agency board process. If this is not so, then contractors would elect to go directly to court and bypass the boards since there would be no advantage in choosing the agency board route for appeals." (*Id.* at p. 25.)

Respondents next assert that language referring to the transfer of "suits" between boards like the IBCA and the Federal Claims Court is an anomaly. Insurers cite language from previous drafts of the Contract Disputes Act where the word "suits" in title 41 United States Code section 609(d) referred to transfers between the federal district court and the Federal Claims Court instead of between the Federal Claims Court and agency boards, and argue that the word "suits" is, essentially, a drafting error.[9] The insurers are correct

---

[9] Section 609(d) states as follows: "Consolidation. If two or more suits arising from one contract are filed in the United States Claims Court [(U.S. Court of Federal Claims)] and one or more agency boards, for the convenience of parties or witnesses or in the interest of justice, the United States Claims Court [(U.S. Court of Federal Claims)] may order the consolidation of such suits in that court or transfer any suits to or among the agency boards involved."

that section 609(d) is anomalous in referring to the administrative remedy as a "suit" when the rest of the statutory scheme consistently characterizes it as an "appeal." We note, however, that in enacting the Contract Disputes Act, Congress completely redrafted this section, and we are not inclined to, nor are we in a position to, find that a typographical error appears in the legislation.

### 3. *Reasonable Expectation of Coverage*

Under the statutory rules of contract interpretation, any ambiguity in the policy terms will be construed against the insurer to protect the insured's reasonable expectation of coverage. Based on the reference to "suits" in 41 United States Code section 609(d) and (e), a reasonable policyholder would believe that a policy providing coverage for a "suit" would provide coverage for the IBCA proceedings.

As the legislative purpose indicates, the IBCA proceeding provides contractors with their "day in court." As noted, this case proceeded in a 22-day IBCA hearing, in which witnesses testified and were cross-examined. The parties then decided to mediate, and reached a settlement in which Ameron agreed to pay the government $10 million. A reasonable policyholder would recognize such proceedings as a suit and would expect to be defended and, if necessary, indemnified by its insurer. It is safe to assume that Ameron would not have proceeded under the IBCA appeals process if it had known that coverage would not be extended to its $10 million settlement with the government.

Given insurers' reliance on a "complaint" for coverage determinations,[10] and our policy of emphasizing substance over form in characterizing pleadings,[11] it is reasonable for all parties to a liability insurance policy that does not define the term "suit" to expect a federal adjudicative administrative agency board proceeding to trigger the defense and indemnity provisions in the policy. *Foster-Gardner* notes that "[a]lthough insureds certainly deserve no less than the benefit of their bargain, insurers should be held liable for no more," and its rule will continue to apply to actions involving pollution remediation orders, or any matters that involve threats to take legal action only, rather than to "suits." (*Foster-Gardner, supra,* 18 Cal.4th at p. 882.) In this case, the agency board proceeding was not a "threat" to take legal action; it was an administrative adjudicative action that dictates our

---

[10] See page 1384, *ante* (insurers rely on complaint for determining duty to cover an action against the insured parties).

[11] See page 1378, *ante*; *AIU, supra,* 51 Cal.3d at page 840 (reimbursement and injunctive relief costs are " 'damages' " for insurance coverage purposes, despite not being within the ordinary definition of " 'damages' ").

departure from *Foster-Gardner*'s rule. The duty to defend and indemnify, if necessary, under the policies was therefore activated by the IBCA proceedings here.

CONCLUSION

For the foregoing reasons, we reverse the Court of Appeal judgment, and remand the matter for proceedings consistent with this decision.

George, C. J., Baxter, J., Werdegar, J., Moreno, J., and Siggins, J.,[*] concurred.

**KENNARD, J.,** Concurring.—I concur in the judgment. In *Foster-Gardner, Inc. v. National Union Fire Ins. Co.* (1998) 18 Cal.4th 857 [77 Cal.Rptr.2d 107, 959 P.2d 265] (*Foster-Gardner*), a decision signed by four justices, this court used a " 'literal meaning' approach" in construing the term "suit" in a standard comprehensive general liability (CGL) insurance policy that did not define that term. (*Id.* at pp. 869–870, 878–880.) Adopting what it termed a " 'bright-line rule' " (*id.* at p. 887), the *Foster-Gardner* majority held that as used in a CGL policy to define the insurer's duty of defense, "suit" unambiguously refers only to court proceedings, and CGL insurers are therefore not obligated to undertake the defense of their policyholders in responding to an administrative agency's pollution remediation order. (*Id.* at pp. 881–882.) I was among the three dissenting justices. (*Id.* at p. 888 (dis. opn. of Kennard, J.).)

When it was decided in 1998, *Foster-Gardner* represented a distinctly minority view. (See *Governmental Interinsurance Exchange v. City of Angola* (N.D.Ind. 1998) 8 F.Supp.2d 1120, 1130 [" 'The vast majority of courts around the United States . . . have found that all kinds of coercive administrative actions . . . are "suits" covered by general liability insurance policies . . . .' "].) Since *Foster-Gardner* was decided, no sister state court has adopted its "literal meaning approach," or its resulting "bright-line rule," in construing the term "suit" in a CGL insurance policy, while courts in nine sister states and federal courts applying the law of two other sister states have rejected that approach, instead adopting either the "functional equivalent" approach or the "hybrid" approach that the *Foster-Gardner* majority rejected. (*Compass Ins. Co. v. City of Littleton* (Colo. 1999) 984 P.2d 606, 622; *R.T. Vanderbilt Co., Inc. v. Continental Casualty Co.* (2005) 273 Conn. 448 [870 A.2d 1048, 1058]; *Travelers Indemnity Co. v. Summit Corp. of America* (Ind.Ct.App. 1999) 715 N.E.2d 926, 934; *Aetna Casualty & Surety Co. v.*

---

[*]Associate Justice of the Court of Appeal, First Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*Commonwealth* (Ky. 2005) 179 S.W.3d 830, 837–838; *Dutton-Lainson Co. v. Continental Ins. Co.* (2010) 279 Neb. 365 [778 N.W.2d 433, 446–449]; *Carpentier v. Hanover Ins. Co.* (N.Y.App.Div. 1998) 248 A.D.2d 579 [670 N.Y.S.2d 540, 542]; *Schnitzer Investment Corp. v. Certain Underwriters at Lloyd's of London* (2005) 197 Ore.App. 147 [104 P.3d 1162, 1168–1169]; *State v. CNA Ins. Cos.* (2001) 172 Vt. 318 [779 A.2d 662, 667]; *Johnson Controls v. Employers Ins. of Wausau* (2003) 264 Wis.2d 60 [665 N.W.2d 257]; *Briggs & Stratton Corp. v. Royal Globe Ins. Co.* (M.D.Ga. 1999) 64 F.Supp.2d 1340, 1345 [applying Ga. law]; *Pacific Employers Ins. Co. v. Servco Pacific Inc.* (D. Hawaii 2003) 273 F.Supp.2d 1149, 1156 [applying Hawaii law].) Thus, over the past 12 years, it has become increasingly apparent that *Foster-Gardner* lies far outside the mainstream of American insurance law.

Here, the court limits *Foster-Gardner*'s "bright-line rule" by holding that it does not apply to administrative agency adjudicative proceedings. The court reaches this result by concluding that the word "suit," when used in a CGL policy that does not define that word, is sufficiently ambiguous that it should be construed to protect the insured's reasonable expectation of coverage. (See maj. opn., *ante*, at p. 1386.) In so doing, the court implicitly rejects *Foster-Gardner*'s reasoning that "suit" unambiguously refers only to court proceedings. (*Foster-Gardner, supra*, 18 Cal.4th at pp. 878–879.) Although I would prefer that *Foster-Gardner* be overruled, the decision here is at least a step in the right direction.

On January 19, 2011, the opinion was modified to read as printed above.