Filed 10/25/18

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THEE SOMBRERO, INC., | |
| Plaintiff and Appellant, | E067505 |
| v. | (Super.Ct.No. CIVDS1502346) |
| SCOTTSDALE INSURANCE COMPANY, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of San Bernardino County. Janet M. Frangie, Judge. Reversed.

Law Office of Guinevere M. Malley and Guinevere M. Malley for Plaintiff and Appellant.

Selman Breitman, Alan B. Yuter, and Rachel E. Hobbs for Defendant and Respondent.

Thee Sombrero, Inc. (Sombrero) owns a commercial property in Colton. Pursuant to a conditional use permit (CUP), Sombrero's lessees operated the property as a nightclub called El Sombrero. Crime Enforcement Services (CES) provided security

guard services at the nightclub. In 2007, after a fatal shooting at the nightclub, the CUP was revoked and replaced with a modified CUP, which provided that the property could be operated only as a banquet hall.

In a previous action, Sombrero sued CES, alleging that CES's negligence caused the shooting, which in turn caused the revocation of the CUP, which in turn caused a diminution in value of the property. It won a default judgment against CES.

Sombrero then filed this direct action (Ins. Code, § 11580, subd. (b)(2)) against Scottsdale Insurance Company (Scottsdale), CES's liability insurer. The trial court granted summary judgment in favor of Scottsdale, ruling that Sombrero's claim against CES was for an economic loss, rather than for "property damage" as defined in and covered under the policy.

We will hold that Sombrero's loss of the ability to use the property as a nightclub constituted property damage, which was defined in the policy as including a loss of use of tangible property.

I

FACTUAL BACKGROUND

The following facts are taken from the evidence admitted in support of and in opposition to the motion for summary judgment, and also from those allegations of the complaint that Scottsdale did not controvert.

Sombrero owned a piece of commercial property in Colton. A conditional use permit (CUP) had been issued authorizing the use of the property as a nightclub. One of

2

the conditions of the CUP was that the city had to approve the floor plan for the property, and thereafter, the floor plan could not be modified without city approval.

In 2007, Sombrero leased the property to new tenants who operated it as a nightclub called El Sombrero. In connection with the new tenancy, the city inspected the property; it approved a floor plan, and it found that the property was in compliance with the floor plan. As part of the floor plan, the club had a single entrance door, equipped with a metal detector.

CES provided security guard services at El Sombrero. It had a corporate general liability policy issued by Scottsdale. The policy covered CES's liability for "property damage" caused by an "occurrence." "Property damage" was defined as either (a) "[p]hysical injury to tangible property, including all resulting loss of use of that property," or (b) "[l]oss of use of tangible property that is not physically injured." "Occurrence," for present purposes, was defined as "an accident."

On June 4, 2007, one patron of El Sombrero shot and killed another. After the shooting, Sombrero learned that CES had converted a storage area into a "VIP entrance" to the club. The VIP entrance had no metal detector. The owner of CES admitted that the gun used in the shooting got into the club through the VIP entrance.

As a result of the shooting, Colton revoked the CUP. Sombrero managed to negotiate a modified CUP, which allowed it to operate the property as a banquet hall rather than as a nightclub.

3

On May 26, 2009, Sombrero sued CES for breach of contract and for negligence. The complaint alleged that CES failed to frisk the shooter and that this failure caused the revocation of the CUP. The revocation of the CUP, in turn, "lower[ed] the resale and rental value of the Property" and caused "lost income." As damages, the complaint sought "the reduction in fair market value of the Property" as well as "lost income."

On May 24, 2012, Sombrero obtained a default judgment against CES for $923,078. Henry Aguila, the president of Sombrero, submitted a declaration in support of the default judgment in which he stated:

"The property went from being valued at $2,769,231 . . . with its large occupancy and nightclub entitlement, to being valued at $1,846,153 after the modified conditional use permit allowing for private banquet use . . . ."

"The difference in value is $923,078."

"[Sombrero] is seeking negligence damages against [CES] . . . in the amount of $923,078, which represents the loss in value due to the modification of the conditional use permit."

II

PROCEDURAL BACKGROUND

On February 20, 2015, Sombrero filed this action against Scottsdale,[1] alleging one

---

**1** Henry Aguila was also named as a plaintiff, but the trial court sustained a demurrer with respect to him, then entered judgment against him.

James Murphy was also named as a defendant but was dismissed without prejudice.

cause of action for breach of the insurance policy.

On May 10, 2016, Scottsdale filed a motion for summary judgment. It argued that the loss of the CUP was not a loss of use of tangible property but merely the loss of an intangible right to use property in a certain way. It also argued that property damage does not include economic loss.

In its opposition, Sombrero argued, among other things, that it lost the use of tangible property due to the revocation of the CUP. It also argued that, when an economic loss results from the loss of use of tangible property, it is covered as property damage.

On October 11, 2016, after hearing argument, the trial court granted the motion. It explained: "The underlying judgment against [CES] was set in the amount of $923,078 based on lost value after the permit was revoked. [Citation.] This amount is what Sombrero is seeking to recover from Scottsdale in this case [citation] and is described by Sombrero as economic loss [citation]. Lost value is economic loss, but economic loss is not lost use of tangible property [citation]. Accordingly, the coverage in Scottsdale's policy for property damage does not extend to Sombrero's economic losses caused by Scottsdale's insureds." (Capitalization altered, punctuation added.)

On November 7, 2016, the trial court entered judgment accordingly.

## III

## THE LOSS OF THE ABILITY TO USE THE PROPERTY AS A NIGHTCLUB

## CONSTITUTED COVERED PROPERTY DAMAGE

Sombrero contends that "[t]he loss of use of the [p]roperty by the revocation of the CUP[] constitutes . . . 'loss of use of tangible property that is not physically injured.'"

A "[d]efendant[] [is] entitled to summary judgment only if 'all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' [Citation.] To determine whether triable issues of fact do exist, we independently review the record that was before the trial court when it ruled on defendant['s] motion. [Citations.] In so doing, we view the evidence in the light most favorable to plaintiff[] as the losing part[y], resolving evidentiary doubts and ambiguities in [its] favor. [Citation.]" (*Martinez v. Combs* (2010) 49 Cal.4th 35, 68.)

"Liability insurance obligates the insurer to indemnify the insured against third party claims covered by the policy by settling the claim or paying any judgment against the insured. [Citation.] Where judgment is obtained against an insured in an action based on bodily injury, death, or property damage, the plaintiff (now a judgment creditor) may bring an action against the insurer on the policy, subject to the policy's terms and limitations, to recover on the judgment. [Citation.] In short, the '"judgment creditor may proceed directly against any liability insurance covering the defendant, and obtain satisfaction of the judgment up to the amount of the policy limits.'" [Citation.] Among

6

the elements that must be proven is that "'"the policy covers the relief awarded in the judgment. . . . "'" [Citation.]" (*Howard v. American Nat. Fire Ins. Co.* (2010) 187 Cal.App.4th 498, 512–513.)

"An insurer's duty of indemnification requires a determination of actual coverage under the policy. [Citation.] . . . [¶] In contrast, '"[a] liability insurer owes a duty to defend its insured when the claim creates any *potential* for indemnity. [Citation.] . . .'" '[T]he insurer must defend in some lawsuits where liability under the policy ultimately fails to materialize; this is one reason why it is often said that the duty to defend is broader than the duty to indemnify.' [Citation.]" (*Advanced Network, Inc. v. Peerless Ins. Co.* (2010) 190 Cal.App.4th 1054, 1060–1061.)

Sombrero persistently argues that Scottsdale had to show that there was no *potential* for coverage. However, as it acknowledges (albeit in throwaway fashion), this standard applies to the duty to defend, not the duty to indemnify. "'[W]hile an insurer has a duty to defend suits which potentially seek covered damages, it has a duty to indemnify only where a judgment has been entered on a theory which is *actually* (not potentially) covered by the policy.' [Citation.]" (*Palmer v. Truck Ins. Exchange* (1999) 21 Cal.4th 1109, 1120.) Thus, Scottsdale only had to show that there was no *actual* coverage.

This does not mean that cases dealing with a duty to defend are irrelevant. If a case holds that there is no duty to defend on facts similar to those here, it necessarily follows that there is also no duty to indemnify. Contrariwise, if a case holds that there is

7

a duty to defend, because there is a *potential* that the facts *might* turn out to be similar to the facts here, it follows that there *is* a duty to indemnify on these facts.

"In general, interpretation of an insurance policy is a question of law and is reviewed de novo under settled rules of contract interpretation. [Citations.]" (*Ameron Intern. Corp. v. Insurance Co. of State of Pennsylvania* (2010) 50 Cal.4th 1370, 1377–1378.) "'Our goal in construing insurance contracts, as with contracts generally, is to give effect to the parties' mutual intentions. [Citations.] "If contractual language is clear and explicit, it governs." [Citations.] If the terms are ambiguous [i.e., susceptible of more than one reasonable interpretation], we interpret them to protect "'the objectively reasonable expectations of the insured.'" [Citation.] Only if these rules do not resolve a claimed ambiguity do we resort to the rule that ambiguities are to be resolved against the insurer. [Citation.]' [Citation.]" (*Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321.)

According to the allegations of Sombrero's complaint against CES, CES's negligence caused the revocation of the CUP, which caused Sombrero to lose the ability to use the property as a nightclub. The loss of the ability to use the property as a nightclub is, by definition, a "loss of use" of "tangible property." It defies common sense to argue otherwise.

Nevertheless, there is some contrary authority. Scottsdale relies on a case with strikingly similar facts, *Scottsdale Ins. Co. v. International Protective Agency, Inc.* (2001) 105 Wash.App. 244 [19 P.3d 1058] (*IPA*). There, Scottsdale insured a security services

company, IPA. One of IPA's clients was a restaurant owned by Northwest Visions. (*Id.* at p. 246.) Northwest Visions sued IPA, alleging, among other things, that IPA negligently allowed a minor to enter the restaurant and, as a result, Northwest Visions lost its liquor license. (*Id.* at p. 247.) Scottsdale refused to defend, on the ground that Northwest Visions was not claiming property damage. Northwest Visions obtained a default judgment against IPA. (*Id.* at p. 247 and fn. 2.) Scottsdale then filed an action for a declaratory judgment regarding its duty to defend. The trial court denied Scottsdale's motion for summary judgment. (*Id.* at p. 247.)

The appellate court reversed. It held that Northwest Visions' "complaint does not allege loss of use of *tangible* property. . . . A liquor license is merely representative of a privilege granted by the state and, as such, is intangible property. [Citation.] . . . The complaint alleges that Northwest Visions lost its *liquor license* thereby destroying its *business*. There is no allegation or evidence in the record that Northwest Visions lost its use of or right to occupy the premises. Even if it had, a right to occupy premises is not a tangible property interest. [Citation.] . . . [¶] . . . Scottsdale correctly argues that there was no property damage within the meaning of the policy because the complaint does not allege that Northwest Visions . . . lost the use of the premises or building for 'any purpose, as owner or lessee, other than one that involves the sale of liquor.' [Citation.]" (*Scottsdale Ins. Co. v. International Protective Agency, Inc.*, *supra*, 105 Wash.App. at pp. 249–250 [19 P.3d at pp. 1061–1062].)

9

*IPA* is helpful, because it outlines the arguments that can be made against the common-sense position, but it is ultimately unpersuasive, for three reasons.

First, the appropriate focus is not on the loss of the entitlement, but rather on the loss of use of tangible property that *results* from the loss of the entitlement. We agree that in *IPA*, the liquor license was not tangible property. Nevertheless, the loss of the liquor license meant that Northwest Visions could no longer use its premises for the remunerative purpose of selling diners alcohol along with their food. Here, identically, the revocation of the CUP meant that Sombrero could no longer use the property as a nightclub.

Second, the reasonable expectations of the insured would be that "loss of use" means the loss of *any* significant use of the premises, not the total loss of all uses. (*Liberty Mut. Ins. Co. v. Wheelwright Trucking Co., Inc.* (Ala. 2002) 851 So.2d 466, 494–495 ["The failure . . . to specify the extent of the loss of use, whether complete uselessness or diminishment in value for a particular purpose, means that, at a minimum, the provision is ambiguous and therefore due to be construed against [the insurer]."]; *Hartzell Industries, Inc. v. Federal Ins. Co.* (S.D. Ohio 2001) 168 F.Supp.2d 789, 795 ["The policy does not specify that the loss of use must be total as opposed to partial."]; see also *Modern Equipment Co. v. Continental Western Ins. Co., Inc.* (8th Cir. 2004) 355 F.3d 1125, 1127, 1129 ["diminished use" of warehouse due to collapse of several sections of storage racks constituted property damage]; contra, *Nova Cas. Co. v. Able Const., Inc.* (Utah 1999) 983 P.2d 575, 580-581.)

California law is in accord.  In *Hendrickson v. Zurich American Ins. Co. of Illinois* (1999) 72 Cal.App.4th 1084 (*Hendrickson*), a group of growers sued Crown Nursery, alleging that it sold them strawberry plants that had been damaged by an herbicide.  (*Id.* at pp. 1086–1087.)  Zurich insured Crown Nursery, but Zurich refused to defend (*id.* at p. 1087), arguing that the growers had not alleged any property damage.  (*Id.* at p. 1089.) The appellate court disagreed:  "Here, the growers' complaint may reasonably be construed as alleging that as a result of [Crown Nursery's] negligent delivery of defective plants, the growers suffered a loss of strawberry production, and thereby a loss of the use of their land.  The policies in this case expressly state that '[l]oss of use of tangible property that is not physically injured' constitutes 'property damage.'  Thus, we conclude that the growers' action presents a potential for coverage which requires a defense."  (*Id.* at p. 1091.)  *Hendrickson* therefore supports our view that a loss of a particular use of tangible property can be property damage.

Scottsdale argues that *Hendrickson* involved a physical injury rather than a loss of use; it asserts, "[T]he court found the insured's contaminated strawberries could have potentially ruined tangible property, namely, the claimants' strawberry crop."  Not so. As quoted above, the court specifically concluded that "the growers suffered . . . *a loss of the use of their land.*"  (*Hendrickson v. Zurich American Ins. Co. of Illinois*, *supra*, 72 Cal.App.4th at p. 1091, italics added.)

Third, we question IPA's statement that "a right to occupy premises is not a tangible property interest."  (*Scottsdale Ins. Co. v. International Protective Agency, Inc.*,

11

*supra*, 105 Wash.App. at p. 250 [19 P.3d at p. 1061].) At least under California law, "[a] lease is . . . a conveyance of an estate in real property . . . . [Citation.]" (*Avalon Pacific-Santa Ana, L.P. v. HD Supply Repair & Remodel, LLC* (2011) 192 Cal.App.4th 1183, 1190.) A building is tangible. Dirt is tangible. Hence, a lessee in possession has a tangible property interest in the leased premises. (Compare *Cunningham v. Universal Underwriters* (2002) 98 Cal.App.4th 1141, 1155–1156 [before tenant takes possession, tenant's right to possess premises is not tangible property; it "is a contractual right that does not mature into a property right until possession actually occurs."] with *Riverbank Holding Co., LLC v. N.H. Ins. Co.* (E.D. Cal. 2012) 2012 U.S.Dist. LEXIS 78781, at *22 [distinguishing *Cunningham*; tenant has tangible property interest in leased premises after tenant "actually took possession of the property."].)

In any event, the issue is not whether, as a technical legal matter, a leasehold is tangible property. Rather, it is whether an insured, reading his or her policy, would understand "tangible property" to include real property that he or she leases. If your leased apartment was rendered uninhabitable by some noxious stench, you would conclude that you had lost the use of tangible property; and if a lawyer said no, actually you had merely lost the use of your intangible lease, you would goggle in disbelief.

Most important, though, our view on this point is dictum, because our case is distinguishable. Here, Sombrero is the owner of the property, not a lessee. As such, it plainly has an interest in tangible property.

12

The trial court did not actually rely on Scottsdale's argument (based on *IPA*) that Sombrero lost only an intangible right to use property in a certain way. Instead, it ruled that Sombrero suffered an economic loss, and that this is not property damage. Scottsdale therefore argues that a "mere economic loss" is not a loss of use of tangible property.

"[S]trictly economic losses like lost profits, loss of goodwill, loss of the anticipated benefit of a bargain, and loss of an investment, do not constitute damage or injury to tangible property covered by a comprehensive general liability policy [citations]." (*Giddings v. Industrial Indemnity Co.* (1980) 112 Cal.App.3d 213, 219.) However, as *Giddings* added, "A complaint seeking to recover damages of this nature from an insured [does] fall[] within the scope of the insurance coverage . . . where these intangible economic losses provide 'a measure of damages to physical property which is within the policy's coverage.' [Citations.]" (*Ibid.*) "In the liability policy context, diminution in market value is accepted as a *proper method of measurement* of any property damages which may have been sustained. [Citations.]" (*Pruyn v. Agricultural Ins. Co.* (1995) 36 Cal.App.4th 500, 510, fn. 6, italics added; accord, *Mid-Continent Cas. Co. v. Circle S Feed Store, LLC* (10th Cir. 2014) 754 F.3d 1175, 1184; *Lucker Mfg. v. Home Ins. Co.* (3d Cir. 1994) 23 F.3d 808, 818, fn. 12.)

In *Hendrickson*, the insurer argued that the growers' claims for lost strawberry production "do not allege a loss of use of property, but claim only economic losses associated with the property, which does not constitute property damage." (*Hendrickson*

13

*v. Zurich American Ins. Co. of Illinois*, *supra*, 72 Cal.App.4th at p. 1090.) The appellate court disagreed: "[T]he alleged loss of profits or diminution in property value are not solely economic losses, but damages because of property damage, and therefore constituted alternative measures of any property damage allegedly sustained. [Citation.]" (*Id*. at pp. 1091–1092.)

The correct principle, then, is *not* that economic losses, by definition, do not constitute property damage. Like the court in *Auto-Owners Insurance Company v. Southeastern Car Wash Systems* (E.D. Tenn. 2016) 184 F.Supp.3d 625, we "find[] it difficult to conceive of loss-of-use damages as anything *other* than economic losses. [Citation.]" (*Id*. at p. 630.) Rather, the correct principle is that losses that are *exclusively* economic, without any accompanying physical damage or loss of use of tangible property, do not constitute property damage.

Here, for the reasons already stated, Sombrero did suffer a loss of use of tangible property. Moreover, the diminution in value of the property was a proper measure of the damages from that loss of use. Thus, the mere fact that Sombrero was seeking to recover damages calculated on the basis of diminution in value falls short of showing that it was not seeking to hold CES liable for a loss of use of tangible property.

At oral argument, Scottsdale asserted for the first time that *Kazi v. State Farm Fire & Cas. Co.* (2001) 24 Cal.4th 871 is on point.[2] There, the Tollaksons sued the Kazis,

_____

[2] Scottsdale had cited *Kazi* in its brief, but only as authority for the definition of "tangible property."

claiming that they had an implied easement over the Kazis' land and that the Kazis had interfered with their easement. Moreover, they claimed that, absent the easement, their own land "was not buildable." (*Id*. at p. 876.) They alleged that the interference with the easement had diminished the value of their own land by $400,000. (*Ibid*.)

The Kazis had three separate insurance policies that covered liability for property damage. One defined property damage as "'physical injury to or destruction of tangible property, including loss of its use.'" (*Kazi v. State Farm Fire and Cas. Co.*, *supra*, 24 Cal.4th at p. 876.) Another defined it as "' . . . damage to or loss of use of tangible property." (*Id*. at p. 877.) The third defined it as "'physical damage to or destruction of tangible property, including loss of use of this property.'" (*Ibid*.) The insurers failed to defend. (*Id*. at pp. 876-877.)

The Supreme Court held that there was no potential coverage, and hence no duty to defend, for two reasons. First, an easement is not tangible property. (*Kazi v. State Farm Fire and Cas. Co.*, *supra*, 24 Cal.4th at pp. 880-885.) Second, the Tollaksons had not claimed that there was any physical damage to their own land. (*Id*. at pp. 885-887.)

*Kazi* is not controlling here because there is a crucial difference between the policy language in *Kazi* and the policy language in this case. *Kazi* relied extensively (see *Kazi v. State Farm Fire and Cas. Co.*, *supra*, 24 Cal.4th at pp. 874-875, 878-884, 887) on the earlier case of *Gunderson v. Fire Ins. Exchange* (1995) 37 Cal.App.4th 1106. *Gunderson* had held, among other things, that when a policy defines property damage as "physical injury to or destruction of tangible property, including loss of its use," it does

15

*not* cover the loss of use of property that has *not* been physically damaged. (*Id.* at

pp. 1117-1119.) Thus, in *Kazi*, the Supreme Court rejected any coverage for loss of use

of the Tollakson's own land on the sole ground that it had not been physically injured.[3]

Here, however, the policy expressly defined property damage as including "[l]oss

of use of tangible property *that is not physically injured.*" (Section I, *ante*, italics added.)

Thus, unlike in *Kazi*, the mere fact that Sombrero's property was not physically damaged

is not dispositive of the question of whether there was coverage for loss of use of that

property.

Finally, Scottsdale relies on *Golden Eagle Ins. Corp. v. Cen-Fed, Ltd.* (2007) 148

Cal.App.4th 976. There, a bank (WMB) sued its landlord (Cen-Fed), alleging that Cen-

Fed had failed to maintain and repair the air conditioning, elevator service, basement

restrooms, landscaping, common areas, interior walls, and paint and had failed to provide

contractually required parking. It further alleged that the failure to maintain and repair

had forced WMB to move its safe deposit boxes from the basement to the first floor, thus

preventing WMB from making any other use of the first floor and decreasing the number

of safe deposit boxes that WMB was able to rent out. (*Id.* at p. 981.)

---

[3] The court even noted that its grant of review, with respect to any coverage for loss of use of the Tollaksons' own land, had been "specifically limited" to whether that portion of the underlying action "involv[ed] physical property damage." (*Kazi v. State Farm Fire and Cas. Co.*, *supra*, 24 Cal.4th at p. 879, fn. 1.) Thus, there was no issue before the court regarding coverage for tangible property that is not physically injured.

16

The appellate court held that Golden Eagle had no duty to defend because WMB was not making a claim for loss of use of tangible property:

"[A] review of the allegations in WMB's complaint shows that there was no claim for any physical injury to tangible property or for any loss of use of tangible property that was not physically injured. Rather, WMB's claim rested *entirely on Cen–Fed's alleged breach of the lease and the resulting economic damage*, including the need to replace its safe deposit boxes to the first floor leased premises, which resulted in fewer boxes being rented and the consequent denial of the use that first floor space for other purposes (that is, a loss of rental *income* and loss of *use* of leased space). The jury determined Cen–Fed's breaches of the lease constituted a diminution in the value of the lease, that is, the difference between the fair market value of WMB's leasehold interest if the leased premises were in the promised condition and the fair market value of those premises in their actual condition. WMB's leasehold interests were not tangible property; and WMB's claim against Cen–Fed did not seek to recover for damage to or the loss of use of tangible property.

"Thus, WMB's complaint and theory of recovery against Cen–Fed did not constitute claims for 'physical injury to tangible property' and therefore they did not constitute claims for 'property damage.' Rather, they amounted to claims for *economic harm* suffered by WMB *due to Cen–Fed's failure to perform its contractual obligations*. . . . 'The property loss section of the standard policy provides coverage for "physical injury or destruction of tangible property which occurs during the policy term." The

17

focus of coverage for property damage is therefore the property itself, and does not include intangible economic losses, violation of antitrust laws or nonperformance of contractual obligations. [Citations.] . . . "[S]trictly economic losses like lost profits, loss of goodwill, loss of the anticipated benefit of a bargain, and loss of an investment, do not constitute damage or injury to tangible property covered by a comprehensive general liability policy . . . .' [Citations.]

"Conceptually, Cen–Fed's claim that the failure to maintain its building in the condition in which it contracted to maintain it is no more a 'property damage' claim than the claim of any property buyer who fails to obtain tangible property in the condition promised or warranted. Such claims are for economic loss, not 'property damage.'" (*Golden Eagle Ins. Corp. v. Cen-Fed, Ltd.*, *supra*, 148 Cal.App.4th at pp. 986–987.)

The lynchpin of this reasoning is that "WMB's leasehold interests were not tangible property . . . ." (*Golden Eagle Ins. Corp. v. Cen-Fed, Ltd.*, *supra*, 148 Cal.App.4th at p. 987.) *Golden Eagle* did not cite any authority for this proposition, and we have found none. As discussed above, in connection with *IPA*, we question whether the proposition is valid; however, anything we have to say on the point is dictum, because here Sombrero owned the property. Hence, we may accept, for purposes of argument, that in *Golden Eagle*, WMB's claim for the diminution in value of its leasehold interest was a claim for economic loss, untethered to an interest in tangible property. Even if so, here, Sombrero's claim for the diminution in value of its ownership interest, even though it was a claim for economic loss, was a claim for loss of use of tangible property.

18

Having so held, we need not discuss Sombrero's alternative arguments that (1) the loss of the CUP itself was a loss of use of tangible property and (2) the construction of the new VIP entrance constituted physical damage to tangible property.[4]

IV

DISPOSITION

The judgment is reversed. Sombrero is awarded costs on appeal against Scottsdale.

CERTIFIED FOR PUBLICATION

RAMIREZ         

P. J.

We concur:

McKINSTER      

J.

MILLER        

J.

---

[4]    Scottsdale argues that, even assuming the construction of the new VIP entrance constituted physical damage to tangible property, that construction was not an "occurrence" within the meaning of the policy. However, because we do not base our opinion on the construction of the VIP entrance, we need not address this argument. Scottsdale does not argue that the shooting was not an "occurrence."