Filed 4/27/26  Yu v. Zoom Video Communications CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SCOTT YU, <br><br>     Plaintiff and Appellant, <br><br> v. <br><br> ZOOM VIDEO COMMUNICATIONS, INC., et al. <br><br>     Defendants and Respondents. | H052030 <br> (Santa Clara County <br> Super. Ct. No. 22CV405290) |

Plaintiff Scott Yu sued defendants Zoom Video Communications, Inc. (Zoom) and its chief executive officer, Eric Yuan, for shares of Zoom stock that plaintiff believed defendants owed him.  Plaintiff, a software engineer, knew Yuan from their previous work together at another company.  Plaintiff alleged that in October 2011, Yuan sought plaintiff's help with an " 'App' " that would later become known as Zoom.  (Boldface omitted.)  According to plaintiff, they reached an agreement for plaintiff to work as a consultant providing user interface (UI) design services through June 2012, and in return, plaintiff would receive 20,000 shares of Zoom stock.

Plaintiff allegedly provided UI services for two months from late October to late December 2011.  Years later, in 2019, Zoom went public.  When plaintiff contacted Yuan to ask about the Zoom shares, he denied that any shares were owed to plaintiff.

Plaintiff filed a civil complaint against Yuan and Zoom in 2022.  In the operative second amended complaint, plaintiff alleged causes of action for breach of contract, breach

of fiduciary duty, and fraud. Defendants filed a demurrer, contending that plaintiff failed to allege sufficient facts as to each cause of action and that the claims were time-barred. The trial court sustained the demurrer to each cause of action without leave to amend. A judgment was subsequently entered in favor of defendants.

On appeal, plaintiff contends that he sufficiently alleged each cause of action, that the claims were not time-barred, and that in any event, the trial court should have granted leave to amend. He also argues that he was denied due process at the hearing on the demurrer.

For reasons that we will explain, we determine that the demurrer was properly sustained as to each cause of action, but that plaintiff should be granted leave to amend as to the breach of contract and fraud causes of action. We will therefore reverse the judgment in favor of defendants and direct the trial court to enter a new order granting leave to amend regarding the breach of contract and fraud causes of action.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Complaint and First Amended Complaint*

Plaintiff filed a civil complaint in September 2022, against Zoom and Yuan for breach of contract and specific performance. Before any responsive pleading was filed by defendants, plaintiff filed a first amended complaint alleging (1) breach of contract, (2) breach of fiduciary duty, (3) fraud, and (4) securities fraud.

Defendants demurred to each cause of action on the ground that plaintiff failed to allege sufficient facts, including that each cause of action was barred by the statute of limitations. The trial court in a tentative written ruling initially overruled the demurrer as to each cause of action except as to the securities fraud claim. However, after a hearing on the demurrer and upon further review, the court filed a written order sustaining the demurrer with leave to amend regarding the (1) breach of contract, (2) breach of fiduciary duty, and (3) fraud claims, and without leave to amend regarding the (4) securities fraud claim. Regarding the first three causes of action, the court determined that plaintiff failed to allege sufficient facts to state a cause of action. The court also indicated that although there was a

2

possibility that the first three causes of action were time-barred, the mere possibility of being time-barred was not a sufficient basis upon which to sustain a demurrer. The court stated that plaintiff was granted leave to amend and that defendants could raise the statute of limitations issue again if warranted by the allegations of an amended pleading.

**B.** *Second Amended Complaint*

### 1. Alleged agreement to provide UI consulting services with compensation in Zoom stock

In the operative second amended complaint, plaintiff alleged that Yuan "solicited" him for UI services. According to plaintiff, before they entered into a contract, they had a "discussion" on October 27, 2011. In that discussion, Yuan disclosed, among other matters, the number of shares of Zoom stock issued and outstanding, the number of shares issued to senior engineers, the amount of capital raised, and Yuan's plan to take Zoom "through successive rounds of venture capital financing leading to an IPO . . . ."[1]

Plaintiff alleged that the parties subsequently entered into a "written contract," which was "documented in an email string between October 27, 2011 and October 29, 2011." Plaintiff alleged that "[a]ll of the terms" of the parties' agreement "were included in the [e]mail [s]tring," which was reprinted in the amended pleading.[2] The e-mail string consisted of the following communications between Yuan and plaintiff:

On October 27, 2011, Yuan e-mailed plaintiff that it was "great to see" him that day. In the e-mail, Yuan explained the proposed project and asked that it be kept confidential. Yuan also stated, "Please let me know your opinion on stocks you would like to get. To

---

[1] "IPO" is the common acronym for an initial public offering of stock.

[2] On appeal, plaintiff contends that the allegations of the second amended complaint "suggest[] that the Agreement could have been partially oral." This contention on appeal contradicts the second amended complaint in which plaintiff alleged that there was "a breach of written contract" and that the contract was "documented in an email string" in October 2011.

start with, you will be our UI consultant[.]  We would like you to join perm[anently] sometime next year after we close the Series A founding."

On October 28, 2011, plaintiff replied by e-mail, expressing his interest in the project.  He also stated, "Yes, I am open to joining full time next year if that's a possibility.  In terms of stock, I am thinking 20,000 shares and no cash.  I have done other work for several very early stage startups . . . and have done Powerpoint presentations for them to show VCs.  The amount of stock is usually around 10,000 shares but the work is more marketing related and timeframe for project is usually 1-2 months.  Since this is more product related, I am thinking 20,000 options or shares to come up with visual design for the client on various platforms.  I am estimating I'll be working part time over a span of 3-4 months while the clients are developed in that timeframe.  If it goes beyond that timeframe with additional work, maybe get some more shares?  [¶]  Let me know if this works for you. . . ."

Yuan e-mailed in part, "Given that we only grant total $40K stock options with a 4-year exer[c]ise plan for senior engineers, so 20,000 is not a small amount.[]  [¶]  However, I do trust you and enjoy the past working experiences with you a lot[] so 20,000 shares is OK with one request below:  [¶]  'It will be busy in the next 3 months till the end of Jan, 2012 as we are developing the product, but the work load will be much less after that, so I want to check if it is possible for you to sign up a one year consultant role till the end of Oct, 2012.[]  BTW, our UI is very simple, so the workload should be very manageable.  You will agree with me if you play a[ro]und the client I sent you yesterday.'  [¶]  Let's have fun together to build a great company. . . ."

The next day, on October 29, 2011, Plaintiff responded by e-mail, stating, "I understand but a full hire would have full pay with benefits and the stocks is a nice bonus whereas I agree to only stock and *there is chance I get nothing at the end*.  Plus if company grows and position opens, I like the opportunity to come in as full-time next year if that is

4

an option. [¶] How about I stay on as consultant til June 2012 and we can decide after that?" (Italics added.)

Yuan e-mailed, "Excellent! End of June works well as I guess by then you already come on board as the regular employee.[] [¶] Thanks much for help, Scott. [¶] Let's work together to build a cool product!"

On October 31, 2011, plaintiff stated in an e-mail, "Awesome. Sounds good. Looking forward to working with everyone on this to make it a success!"

In the second amended complaint, plaintiff alleged that the parties understood that plaintiff's October 29, 2011 statement, "I agree to only stock and there is a chance I get nothing at the end," meant he "only receives Zoom Stock 'at the end' *of venture financing, and if Zoom never has its IPO*, 'there is a chance I got nothing in the end.' " (Italics omitted & added.) Plaintiff alleged that his e-mail thus "expressly direct[ed] Mr. Yuan's attention to the fact [p]laintiff's UI Services [were] being provided for Zoom [s]tock to be held and protected, but not delivered until after Zoom's IPO." According to plaintiff, based on the exchange of e-mails, the parties "had a [m]eeting of the [m]inds on all terms of the contract, thereby rendering Plaintiff's Zoom [s]tock transferrable to him, after his performance of UI Services, and if and when Zoom had its IPO."

Plaintiff alleged that, the delayed transfer provision "was carefully negotiated. Based on his experience providing services for shares in the past, [he] proposed it as a solution to avoid incurring a taxable event until the IPO, when he would have liquid shares that could be sold to pay the taxes. This delayed transfer feature is common in forward contracts, which companies also favor. By having legal title to the shares remain with either the company, or in the name of the original stockholder, often a company founder . . . in constructive or resulting trust, companies can prevent uncontrolled distribution of their shares, thereby avoiding transfers to parties with different agendas." "Forward contracts help companies preserve their cash position, reduce burn-rate and keep title with existing shareholders."

Plaintiff further alleged that "[c]ompany [f]ounders like Mr. Yuan often hold large positions in illiquid shares. They are often approached by investors . . . who pay the [f]ounder upfront (in cash or services), but instead receiving [*sic*] the shares immediately upon delivery of payment or services, the [f]ounder (or their company) continues to hold the shares until the IPO, when they are transferred to the [b]eneficial [s]tockholder. The shares remain in the [f]ounder's name on the company's stock ledger until after an IPO when they are transferred (the 'Trust Period')." (Boldface & italics omitted.) According to plaintiff, "Yuan was familiar with the challenges of owning large blocks of valuable but illiquid shares. It is common practice for founders of startups like Mr. Yuan enter [*sic*] into, grant or decline others permission to, or at least be familiar with forward contracts . . . ."

Plaintiff alleged that "Yuan used the [f]orward [c]ontracts to induce consultants, like [p]laintiff to provide services to the [f]ounder personally, or to their company or both . . . ." Plaintiff further alleged that he "did not ask Mr. Yuan to transfer his Zoom [s]tock to him until after the IPO. Plaintiff understood and intended for the transfer to occur after the IPO, just as he expressly pointed out to Mr. Yuan in . . . his email" that "there is chance I get nothing at the end." According to plaintiff, Yuan "also understand that Plaintiff's Zoom stock wasn't to . . . [be] transferred until after the IPO." As evidence of this understanding by Yuan that the Zoom stock would not be transferred until after the IPO, plaintiff alleged that Yuan accepted plaintiff's UI services and plaintiff worked without receiving any compensation.

Plaintiff alleged that he performed UI services for two months from late October to late December 2011. On December 23, 2011, Yuan e-mailed plaintiff to wish him a happy holiday. In the e-mail, Yuan also stated, "BTW, given that you are very busy and may not have enough time and bandwidth as we have so many UI related issues, so we decided to hire a full time visual UI engineer in China to help us quickly modify our UI in full speed [¶] Your wonderful help in Nov is greatly appreciated. We will not bother you again

6

during your night time :-)  [¶]  Cheers."  According to plaintiff, he nevertheless "remained available for additional projects through June 2012 as agreed."

### 2. Communications after end of consulting services

Between December 2011, and October 2019, plaintiff and Yuan "maintained contact via text message, e-mail, and telephone calls."  During that period of time, Yuan allegedly never told plaintiff that his UI services were unacceptable, or that Zoom stock would not be transferred to him.  Instead, "[t]hey discussed Zoom's growth, success, closing of venture capital rounds, and progress toward the IPO."

For example, plaintiff sent an e-mail on February 4, 2015, stating, "Hey congrats on the C round."  Yuan responded, "Thanks my friend."

In another e-mail exchange initiated by plaintiff on April 7, 2015, he wrote, "Wow.[] Saw your billboard on 101," in reference to a billboard advertising Zoom as number one in web conferencing.  Yuan responded, "Thanks!"

On April 8, 2015, plaintiff again e-mailed Yuan, stating, "Hey let me know if you guys doing another round.[]  haha.[]  i would love to put in $10K of my money.  Or when you go IPO, reserve some friends and family shares for me!"  Plaintiff did not allege whether Yuan responded to this e-mail.

On April 21, 2017, plaintiff attempted to help his wife get a job at Zoom.  He e-mailed Yuan, "How are you doing?  Hey congrats on the continuing success of Zoom! 500+ people already.  wow!  We should grab lunch if you have time.  I sometimes work from home Fridays.  Let me know if you have a free day.  [¶]  Hey also wanted to refer my wife to a lead UI position there.  She's doing UX for [other companies] and she was interested in a position at Zoom.  [¶]  I have enclosed her resume.  [¶]  Let me know if I can help with anything.  You guys need help with web site?  Maybe creative director position? :-)  anyways, congrats again!"  In response, Yuan e-mailed, "Thank you, Scott.  [¶]  I will let our team take a look at your wife's resume...  Stay tuned.  [¶]  Thanks."

7

### 3. Zoom's stock split and IPO

Plaintiff alleged that in 2018, Zoom completed a "four . . . to one" stock split, which resulted in his "initial right to 20,000 shares" becoming 80,000 shares.

Plaintiff alleged that Zoom went public in April 2019, and that a six-month lockup period expired on October 15, 2019. According to plaintiff, defendants were obligated to transfer Zoom stock to him either that day, or the next day, pursuant to their agreement.

### 4. Plaintiff's request for shares and defendants' refusal

On September 28, 2019, a couple of weeks before the lockup period expired, plaintiff sent a text message to Yuan, referring to the work that plaintiff had previously completed. Plaintiff stated, "Hi Eric, thanks. I looked through all the emails again to refresh everything. From emails, I can see we agreed I would work from November to June and you were okay with that. You suggested a 1 year contract but then I discussed some more with you and we agreed it was okay to just start now and in June, you and I both agree I would transition to a full time employee. So I basically worked a total of 2 months for you based on our agreement before you said you no longer needed my services and declined to give me the full time position. But I did start the work and did the work for 2 months."

Yuan texted back to plaintiff, "We can't grant any stock without signing 12 months advisor work. [¶] I do not think you worked for us for 2 months as the initial UI does not fit well. And I mentioned to you at that time. Hope you can remember that." Yuan also texted to plaintiff, "Sorry about the confusion. . . we should have made it very clear back then. . . thank you my friend." Plaintiff alleged that contrary to Yuan's text message, Yuan had "accepted . . . without complaint" plaintiff's UI services.

On October 3, 2019, plaintiff texted to Yuan, "Hi Eric, good morning. I spent last few days talking to legal experts and they all said I should be paid those shares for the work I did. I prayed about it these past several days and I think maybe best thing is to send letter to the company asking for payment due to miscommunication or oversight etc and just let the company handle it. My ideal scenario is I go there and sign something that's fair and

8

everything is properly documented this time and all misunderstandings resolved. You know I have always supported your work every step of the way and I hope we'll always be friends. If legally I am not entitled to anything, as I mentioned, I am fine with that but at least I know and can move forward."

Yuan texted to plaintiff, "Let's either go with the court or I might pay you two month let time cash. Your call. I checked with our legal counsel as well and we strongly think we do not have any issues. [¶] Part time cash even we did not use any of your work. [¶] I will let our General counsel . . . work with you and we will handle it professionally and legally."

### 5. Contract and tort claims

In the second amended complaint, plaintiff alleged separate breach of contract causes of action against Yuan individually and against Zoom. Plaintiff alleged that the parties' written contract, which was reflected in the e-mail string between October 27 and 29, 2011, required plaintiff to provide UI services in exchange for 20,000 shares of Zoom stock, which was to be transferred to him after Zoom's IPO. Defendants allegedly breached the agreement by refusing to transfer any shares after the IPO.

In the causes of action for breach of fiduciary duty against Yuan and Zoom, plaintiff alleged that Yuan "established a fiduciary relationship" with plaintiff "in at least two" ways. First, based on the agreement, Yuan agreed "to accept responsibility for protecting and safeguarding [p]laintiff's Zoom [s]tock" until the transfer of the shares after the IPO. In this respect, plaintiff was a beneficial stockholder or an equitable owner. Second, Yuan disclosed confidential Zoom information to plaintiff, who then decided to provide UI services, without compensation and with only Yuan's promise that stock would be transferred after Zoom's IPO.

In the causes of action for "fraud based on deceit based on false promise" against Yuan and Zoom, plaintiff alleged that Yuan falsely promised to transfer Zoom stock when he stated, "20,000 shares is OK" and "20,000 is not a small amount."

9

**C.** *Defendants' Demurrer to the Second Amended Complaint*

Zoom and Yuan demurred to the second amended complaint on the grounds that all the causes of action (1) failed to state a claim for relief as to either defendant and (2) were time-barred. Regarding the failure to state a breach of contract claim, defendants contended that the e-mails alleged in the pleading did not show that defendants agreed to hold Zoom shares for plaintiff until an IPO. Regarding the breach of fiduciary duty claim, defendants argued that neither Yuan's disclosure of company confidences to plaintiff, nor the alleged consulting agreement, created a fiduciary relationship between Yuan and plaintiff. Regarding the fraud claim, defendants contended that plaintiff failed to identify a fraudulent statement by Yuan that shares would be held until an IPO or liquidity event, and failed to allege that Yuan held the requisite fraudulent intent. Lastly, defendants contended that all the claims were time-barred under the applicable statutes of limitations because the alleged contract, UI services, and representations by Yuan occurred in 2011, and plaintiff's complaint was not filed until more than 10 years later in 2022.

**D.** *Plaintiff's Opposition*

Plaintiff contended that his causes of action were sufficiently alleged and timely filed. Regarding the contract cause of action, plaintiff argued that the parties agreed that Yuan would transfer the shares " 'at the end' of the venture financing process, when shares become liquid, post-IPO."

Plaintiff contended that a fiduciary relationship existed because Yuan (1) promoted a stock offering to plaintiff, (2) disclosed confidential information about Zoom as part of the stock offering, (3) directed plaintiff to begin performance "which implied holding the [s]hares on behalf of, and for the benefit of" plaintiff, (4) served as Zoom's agent, officer, and director which created fiduciary obligations to plaintiff who was awaiting transfer of the shares, and (5) "solicit[ed] a high-degree of trust from [plaintiff] to hold, and later transfer the [s]hares."

10

Regarding the fraud claim, plaintiff contended that Yuan falsely promised that "20,000 shares is OK" as payment for plaintiff's UI services. Plaintiff reiterated the argument that the parties' agreement included a provision that the shares would be transferred after an IPO.

Plaintiff contended that all of his claims were timely because the statutes of limitations did not begin to run until he discovered, or should have discovered, his claims. Plaintiff argued that he had no reason to know of any breach or fraud until after the IPO, or until Yuan stated on October 3, 2019 that he would not transfer the shares. Plaintiff also contended that because of the fiduciary relationship, the statute of limitations did not begin to run until Yuan denied the obligation to transfer the shares on October 3, 2019. Under these circumstances, the filing of the complaint on September 28, 2022 was timely according to plaintiff.

E. *Defendants' Reply*

Defendants contended that there was no contractual provision regarding delayed transfer of Zoom shares until six months after an IPO. Regarding plaintiff's contention that his shares could not be delivered upon completion of his UI services and that the shares could be delivered only after the IPO when they were " 'transferable,' " defendants argued that plaintiff was "conflat[ing] the ability to sell shares on the public market with the ability of a company to grant shares while still privately held." Defendants argued that plaintiff's statement during the e-mail exchange that he might "get nothing at the end" was his explanation that he was taking a bigger risk than engineers who were paid in cash and shares, because if the company did not succeed his shares would be worthless and he would not receive any cash. Defendants contended that the "get nothing at the end" statement did not have anything to do with holding shares for plaintiff until an IPO. In the absence of this contractual provision, all that remained in the pleading were allegations of a failure to pay for services rendered in 2011. Defendants argued that all of the claims were based on this failure to pay and were barred by the applicable statute of limitations. Defendants also

11

contended that none of plaintiff's theories regarding a fiduciary relationship or a false promise were supported by the factual allegations in the pleading.

## F. *Trial Court's Order*

A hearing was held on defendants' demurrer. The trial court subsequently filed an order sustaining the demurrer without leave to amend.

Regarding the breach of contract claims, the court determined that no contract was formed as to the provision of 20,000 shares. Even assuming there was a meeting of the minds regarding plaintiff providing UI consulting services for 20,000 shares, the court found the allegations insufficient to establish that Yuan agreed to hold, safeguard, and then deliver the shares on a date after the IPO. The court determined that the plain meaning of plaintiff's statement in the e-mail that he might receive nothing in the end was that if he took payment in stock, the stock may never be worth anything, so he may get nothing in the end. The court determined that the contract claims were time-barred in the absence of plaintiff's unsubstantiated theory that defendants agreed to hold the stock for a period of time. In this regard, the court relied on Civil Code section 1657, which requires a reasonable time for performance if no time is specified. The court explained that Yuan could have transferred the shares to plaintiff upon his completion of services in December 2011, or shortly thereafter. The court reasoned that the four-year statute of limitations began to run after expiration of a reasonable time thereafter, and that the breach of contract claim was time-barred as a matter of law in view of the passage of 10 years since the time that the shares could have been transferred.

Regarding the breach of fiduciary duty claims, the trial court determined that plaintiff failed to sufficiently allege the creation of a fiduciary relationship between the parties.

Regarding the fraud claims, the trial court found that plaintiff failed to allege a statement by Yuan indicating that he intended to hold Zoom's shares for plaintiff until a liquidity event and then transfer the shares to plaintiff thereafter. Further, the court determined that Yuan did not make an unconditional promise to give plaintiff 20,000 shares.

12

Rather, the offer of 20,000 shares was on the condition that plaintiff remain available as a consultant for one year.

As plaintiff failed to identify additional facts that could be alleged to survive a demurrer, the court sustained the demurrer without leave to amend.

A judgment was subsequently entered in favor of defendants. Plaintiff timely appealed.

## II. DISCUSSION

On appeal, plaintiff contends that he sufficiently alleged each cause of action, and that his claims were not time-barred. He also argues that, to the extent any cause of action was not sufficiently alleged, the trial court should have granted leave to amend. Plaintiff further contends that he was denied due process at the hearing on the demurrer.

We first set forth the standard of review regarding on order sustaining a demurrer without leave to amend before analyzing plaintiff's contentions as to each cause of action. We separately consider his due process claim.

### A. *Standard of Review*

On appeal, "the plaintiff bears the burden of demonstrating that the trial court erred" in sustaining the demurrer. (*Cantu v. Resolution Trust Corp.* (1992) 4 Cal.App.4th 857, 879.)[3] In reviewing "an order sustaining a demurrer, 'we examine the complaint de novo to

---

[3] "To demonstrate error, [the] appellant must present meaningful legal analysis supported by citations to authority and citations to facts in the record that support the claim of error." (*In re S.C.* (2006) 138 Cal.App.4th 396, 408.) Case citations with "no jump cites to the pages of those cases where pertinent holdings purportedly exist" are "unhelpful." (*Id.* at p. 411.) Similarly unhelpful are case citations where "appellant's counsel makes no effort to explain how the authorities support [the] claim of error." (*Id.* at p. 412) "[I]t is not the role of an appellate court to carry appellate counsel's burden." (*Ibid.*)

In this case, we note that plaintiff's opening and reply briefs on appeal contain many citations that do not appear to support the propositions for which they are cited. Further, many of plaintiff's citations do not include a jump cite to the page that purportedly supports the proposition for which the case is being cited. (See, e.g., fn. 4, *infra*.) Regarding any future filing in this court, plaintiff's counsel are admonished to provide (1) legal citations

determine whether it alleges facts sufficient to state a cause of action . . . .' " (*Committee for Green Foothills v. Santa Clara County Bd. of Supervisors* (2010) 48 Cal.4th 32, 42 (*Committee*).) "[A] complaint must contain a 'statement of the facts constituting the cause of action, in ordinary and concise language.' [Citation.]" (*Ameron Internat. Corp. v. Insurance Co. of State of Pennsylvania* (2010) 50 Cal.4th 1370, 1384.) In reviewing the complaint, "we give the complaint a reasonable interpretation, and read it in context." (*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 (*Schifando*).) We "must assume the truth of the complaint's properly pleaded or implied factual allegations" (*ibid.*), "drawing all reasonable inferences in favor of [the plaintiff's] allegations" (*Harris v. Capital Growth Investors XIV* (1991) 52 Cal.3d 1142, 1170, fn. 16 (*Harris*)). However, we do not assume the truth of " ' "contentions, deductions or conclusions of fact or law." ' " (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6.)

Further, " '[i]t is not the ordinary function of a demurrer to test the truth of the plaintiff's allegations or the accuracy with which he describes the defendant's conduct. A demurrer tests only the legal sufficiency of the pleading. [Citation.] It "admits the truth of all material factual allegations in the complaint . . . ; the question of plaintiff's ability to prove these allegations, or the possible difficulty in making such proof does not concern the reviewing court." ' [Citation.]" (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 47.) Questions of fact are "not amenable to resolution on demurrer" (*Miyahara v. Wells Fargo Bank, N.A.* (2024) 99 Cal.App.5th 687, 703 (*Miyahara*)) unless "there is only one legitimate inference to be drawn from the allegations of the complaint" (*TracFone Wireless, Inc. v. County of Los Angeles* (2008) 163 Cal.App.4th 1359, 1368).

When a demurrer is sustained without leave to amend, "we must decide whether there is a reasonable possibility the plaintiff could cure the defect with an amendment. [Citation.]" (*Schifando*, *supra*, 31 Cal.4th at p. 1081.) " ' "[I]t ordinarily constitutes an

that support the propositions for which they are being cited, (2) adequate and relevant explanations regarding citations, and (3) jump cites to the relevant pages.

abuse of discretion to sustain a demurrer without leave to amend if there is a reasonable possibility that the defect can be cured by amendment. [Citations.]" ' [Citations.] This abuse of discretion is reviewable on appeal 'even in the absence of a request for leave to amend' [citations] . . . ." (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 970-971.) "The plaintiff has the burden of proving that an amendment would cure the defect." (*Schifando*, *supra*, at p. 1081.)

## B. *Breach of Contract*

In the breach of contract causes of action against Yuan and Zoom, plaintiff alleged that the parties' written contract, which was reflected in the October 2011 e-mail string, provided that plaintiff would perform UI services in exchange for 20,000 shares of Zoom stock, which were to be transferred to plaintiff after Zoom's IPO. Defendants allegedly breached the agreement by refusing to transfer any shares after the IPO. The trial court sustained defendants' demurrer for failure to state sufficient facts, finding that no contract was formed and, to the extent there was a contract, it did not contain a provision regarding a delayed transfer of shares and was therefore time-barred.

On appeal, plaintiff contends that the parties had a contract in which he would provide UI services in exchange for Zoom shares that would not be transferred to him until after an IPO. Based on the delayed transfer provision, plaintiff argues that the statute of limitations did not begin to run on his breach of contract claims until 2019, after the IPO and after Yuan's express refusal to transfer the shares. Plaintiff also contends that the statute of limitations did not commence or was tolled such that his breach of contract claims were timely filed.

### 1. Contract formation—services for stock shares

"An essential element of any contract is the consent of the parties, or mutual assent. [Citations.]" (*Donovan v. RRL Corp.* (2001) 26 Cal.4th 261, 270 (*Donovan*).) "Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their

15

unexpressed intentions or understandings.  [Citation.]"  (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 141 (*Alexander*); accord, *Patel v. Liebermensch* (2008) 45 Cal.4th 344, 352 [explaining that the parties' "undisclosed intentions would not have become part of the contract"].)

"Mutual assent usually is manifested by an offer communicated to the offeree and an acceptance communicated to the offeror.  [Citation.]"  (*Donovan*, *supra*, 26 Cal.4th at pp. 270-271.)  " ' " 'An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.' " [Citations.]' [Citation.]  The determination of whether a particular communication constitutes an operative offer, rather than an inoperative step in the preliminary negotiation of a contract, depends upon all the surrounding circumstances. [Citation.]  The objective manifestation of the party's assent ordinarily controls, and the pertinent inquiry is whether the individual to whom the communication was made had reason to believe that it was intended as an offer.  [Citations.]"  (*Donovan*, *supra*, at p. 271.)

"[T]he failure to reach a meeting of the minds on all material points prevents the formation of a contract even though the parties have orally agreed upon some of the terms, or have taken some action related to the contract.  [Citations.]"  (*Banner Entertainment, Inc. v. Superior Court* (1998) 62 Cal.App.4th 348, 359, italics omitted (*Banner Entertainment*); see *id.* at pp. 357-358.)

If conflicting inferences may be drawn as to whether a contract was formed, it is for the fact finder to determine whether a contract exists.  (*Alexander*, *supra*, 104 Cal.App.4th at p. 141.)  Questions of fact are "not amenable to resolution on demurrer" (*Miyahara*, *supra*, 99 Cal.App.5th at p. 703.)

In this case, the trial court determined that the e-mails between plaintiff and Yuan reflected only negotiations and that no contract was formed.  Similarly, defendants contend in this court that no contract was formed in the e-mail string between plaintiff and Yuan regarding UI services in exchange for 20,000 Zoom shares.  According to defendants, the

16

parties simply engaged in negotiations with successive counterproposals without ever reaching an agreement on the same set of terms.

Although this might be one interpretation of the e-mails, we conclude that it is not the only reasonable interpretation. The e-mails may also be reasonably viewed as the parties whittling down the terms being negotiated until ultimately, both plaintiff and Yuan agreed that plaintiff would provide UI services through June 2012, and that he would be compensated with 20,000 Zoom shares. At the outset of the e-mails, both understood the negotiations involved UI services with compensation in the form of stock. In the concluding e-mails, both understood that they had reached an agreement. It is reasonable to infer that neither party at the conclusion of the e-mails thought plaintiff was going to provide nearly eight months of consulting services, from late October 2011 through June 2012, for free. Although conflicting inferences might be drawn as to whether a contract was formed regarding UI services in exchange for 20,000 Zoom shares, this is not a sufficient basis upon which to sustain a demurrer. (See *Alexander*, *supra*, 104 Cal.App.4th at p. 141 [explaining that the trier of fact must determine whether a contract exists if conflicting inferences may be drawn]; *Miyahara*, *supra*, 99 Cal.App.5th at p. 703 [stating that factual questions may not be resolved on demurrer].)

We observe that plaintiff further argues that "the timing of the stock transfer [was] not material to the contract's validity" or "to the contract's existence itself." According to plaintiff, because timing was not a material term, the "trial court incorrectly held that the absence of a term obligating [d]efendants to hold shares until a liquidity event . . . precluded contract formation." (See *Banner Entertainment, supra*, 62 Cal.App.4th at p. 359 [stating that parties must reach "a meeting of the minds on all material points" to form a contract].) Plaintiff's allegations in the second amended complaint appear to imply that the timing of the transfer of shares—and specifically the holding of the shares until after an IPO occurred—was a material term, at least to plaintiff. He alleged in the pleading that he "proposed" the delayed transfer, that he "expressly direct[ed] Mr. Yuan's attention" to it,

17

and that the provision "was carefully negotiated." We need not resolve in this appeal, however, whether the transfer of stocks after an IPO was a material term. As we explain *infra*, in the absence of sufficient allegations about the existence of this term (regardless of whether the term was material), plaintiff's breach of contract claim was time-barred. We therefore turn to the question of whether the parties' agreement included such a term regarding the delayed transfer of shares.

### 2. Contract interpretation—no delayed transfer provision

" 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.]' The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" [citation], controls judicial interpretation. [Citation.]' " (*Waller v. Truck Ins. Exchange, Inc*. (1995) 11 Cal.4th 1, 18 (*Waller*).)

A contractual provision "will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. [Citation.]" (*Waller*, *supra*, 11 Cal.4th at p. 18.) "On a demurrer, the court must consider the sufficiency of the allegations, including any [extrinsic] evidence allegations, to determine whether the contract is reasonably susceptible to the plaintiff's alleged interpretation." (*George v. Automobile Club of Southern California* (2011) 201 Cal.App.4th 1112, 1128.) If the "contract is not reasonably susceptible to the meaning alleged in the complaint, it is proper to sustain a demurrer without leave to amend." (*Ibid*.)

Competent extrinsic evidence may include the parties' discussions at the time the contract was negotiated, but not a party's "uncommunicated subjective intent as to the meaning of the words of the contract." (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1167; see *id*. at p. 1166, fn. 3.) Competent extrinsic evidence may also include "the circumstances which attended the making of the agreement, ' ". . . including the object, nature and subject

18

matter of the writing . . ." so that the court can "place itself in the same situation in which the parties found themselves at the time of contracting." [Citations.]' [Citation.]" (*Id*. at p. 1168.)

" 'Usage or custom may be looked to, both to explain the meaning of language and to imply terms, where no contrary intent appears from the terms of the contract.' [Citation.]" (*Howard Entertainment, Inc. v. Kudrow* (2012) 208 Cal.App.4th 1102, 1114, fn. omitted [determining that "[c]ustom and usage in the entertainment industry . . . may become part of the oral agreement between the parties to explain whether [the plaintiff] was entitled to receive posttermination compensation"].)

Evidence " ' " 'derived from experience and practice can . . . trigger the incorporation of additional, implied terms.' " ' [Citation.] 'Implied contractual terms "ordinarily stand on equal footing with express terms" ' [citation], provided that, 'as a general matter, implied terms should never be read to vary express terms' [citation]." (*Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1178-1179.)

The time of payment may be "a contract term determinable by implication as a matter of law." (*Patel v. Liebermensch* (2008) 45 Cal.4th 344, 350.) Civil Code section 1657 provides that, "[i]f no time is specified for the performance of an act required to be performed, a reasonable time is allowed. If the act is in its nature capable of being done instantly--as, for example, if it consists in the payment of money only--it must be performed immediately upon the thing to be done being exactly ascertained."

In this case, the trial court indicated that even if the parties agreed to a "simple exchange of services for stock," there was no term providing that the transfer of shares would occur after an IPO. On appeal, plaintiff contends that he alleged sufficient facts showing that the parties' contract had a delayed transfer clause pursuant to which the Zoom shares would not be transferred to him until after an IPO.

We determine that the parties' contract, as allegedly documented in e-mails between October 27 and 29, 2011, did not contain an express term regarding when the shares would

be transferred, let alone an express term that the transfer would be delayed until after an IPO. Indeed, plaintiff admitted the absence of an express term at the hearing on the demurrer to the second amended complaint by stating, "We're not saying there was an expression by either party that the shares would be held for some time. We're not saying that. Never have." Plaintiff on appeal also acknowledges the lack of an express term when he argues that the "trial court erred by focusing on the absence of a specific 'Delayed Transfer Clause.' "

Plaintiff contends that Yuan was "a sophisticated party who did not clarify terms at the outset," "ambiguities are interpreted against the drafter," and any ambiguity in the parties' agreement "should be construed against" Yuan. It appears, however, that any ambiguity regarding a delayed transfer was introduced by plaintiff. Plaintiff allegedly told Yuan, "I agree to only stock and there is chance I get nothing at the end." Plaintiff alleged that when he made this statement, he actually meant he "only receives Zoom Stock 'at the end' *of venture financing, and if Zoom never has its IPO*, 'there is a chance I got nothing in the end.' " (Italics omitted & added.) Plaintiff further alleged that he "proposed" the delayed transfer, that he "expressly direct[ed] Mr. Yuan's attention" to it, and that it "was carefully negotiated." These allegations and the authority cited by plaintiff do not support his argument that ambiguity about a delayed transfer must be construed against Yuan.

Plaintiff also argues that Yuan's post-agreement conduct provided "further evidence" of an agreement to delay the transfer of shares until after an IPO. For example, plaintiff alleges that in post-agreement communications, the parties discussed "Zoom's growth toward IPO." Plaintiff also refers to allegations that Yuan accepted the UI services provided by plaintiff without objection and without any notice to plaintiff that the shares would not be transferred later. These allegations, however, are insufficient to raise a reasonable inference that Yuan agreed to hold the shares until after an IPO. For example, Yuan's post-agreement communications about progress toward an IPO do not in any way suggest that he understood the shares were being held by defendants until an IPO occurred.

20

We understand plaintiff to contend that the parties' alleged agreement should be interpreted to include or have an implied term regarding the delayed transfer of shares. In this regard, plaintiff argues that there was an "industry[] standard practice of post-IPO share transfer, which is supported by the phrase 'at the end' in the emails." Plaintiff argues that "[i]ndustry norms in stock compensation often involve delaying stock transfers to defer taxable events until the stock becomes liquid. Holding shares in trust until an IPO is one such method . . . ."

In the operative pleading, plaintiff alleged that his October 29, 2011 e-mail "expressly direct[ed] Mr. Yuan's attention to the fact [p]laintiff's UI [s]ervices [were] being provided for Zoom [s]tock to be held and protected, but not delivered until after Zoom's IPO." Specifically, plaintiff alleged that his e-mail in which he referred to the "chance" that he might "get nothing at the end" meant that he "only receives Zoom Stock 'at the end' *of venture financing*, *and if Zoom never has its IPO*, 'there is a chance I got nothing in the end.' " (Italics omitted & added.)

Regarding the delayed transfer, plaintiff alleged that he "proposed it as a solution to avoid incurring a taxable event until the IPO, when he would have liquid shares that could be sold to pay the taxes." He alleged that "[t]his delayed transfer feature is common in forward contracts," and that it was "common practice for founders of startups like Mr. Yuan enter [*sic*] into, grant or decline others permission to, or at least be familiar with forward contracts. . . ." Plaintiff alleged that "Yuan used the [f]orward [c]ontracts to induce consultants, like [p]laintiff to provide services to the [f]ounder personally, or to their company or both . . . ." Plaintiff alleged that both he and Yuan understood that the stock would not be transferred until after the IPO. As evidence of Yuan's understanding, plaintiff alleged that Yuan accepted plaintiff's UI services and plaintiff worked without receiving any compensation.

It is not readily apparent from plaintiff's allegations why his statement about the "chance" that he might "get nothing at the end" was reasonably understood by Yuan to

21

mean that the transfer of the shares would be delayed until after an IPO occurred and that Yuan agreed to such an arrangement. Even assuming contracts in the industry commonly delay the transfer of shares, plaintiff's statement about the "chance" that he might "get nothing at the end" was hardly a clear proposal and plaintiff further alleged that startup founders such as Yuan had a "common practice" to "enter into, grant *or decline*" such "forward contracts." (Italics added.) Thus, even if the standard contract in the industry included a delayed transfer, it appears equally the case based on plaintiff's allegations that startup founders such as Yuan may have commonly "decline[d]" such arrangements. Nothing in the parties' e-mails, nor in Yuan's alleged subsequent conduct, gives rise to a reasonable inference that Yuan understood and agreed to a delayed transfer in this case.

On appeal, plaintiff now contends that he can amend the pleading to "include instances of assurance made by Mr. Yuan regarding the holding period, and contingent upon a liquidity event such as an IPO." We understand plaintiff to also argue that he can amend the pleading regarding "industry norms," including "how equity grants and stock options for startups are typically structured around liquidity events like IPOs." We understand plaintiff to contend that the additional allegations would support a reasonable inference in this case that a post-IPO transfer of shares was the mutual intent of the parties at the time the contract was formed, rather than simply plaintiff's unexpressed understanding. (See *Waller*, *supra*, 11 Cal.4th at p. 18 [explaining that " 'the mutual intention of the parties at the time the contract is formed governs interpretation' "].)[4] On this basis, there appears to be a

---

[4] Plaintiff cites *Techno Lite, Inc. v. Emcod, LLC* (2020) 44 Cal.App.5th at pages 472 to 473, to support his argument that "numerous California cases including *Techno Lite, Inc.*" have "recognized" the "well-established Silicon Valley industry norms tying equity realization to liquidity events." Similarly, he refers to the purported "well-documented industry norms in Silicon Valley, where equity arrangements routinely anticipate extended periods before realization, particularly in startups, as recognized in *Techno Lite, Inc. v. Emcod, LLC* (2020) 44 Cal.App.5th 462, 472-473 . . . ." We do not find in *Techno Lite* any such discussion either in the pages cited by plaintiff or anywhere else in the opinion. Instead, in *Techno Lite*, the appellate court "reject[ed] appellants' argument that they could not be found liable for fraud because their promise not to compete against their current

reasonable possibility that plaintiff can cure this defect in the breach of contract cause of action. (See *Schifando*, *supra*, 31 Cal.4th at p. 1081.)

### 3. Statute of limitations

The statute of limitations for a cause of action for breach of a written contract is four years. (§ 337, subd. (a).) Generally, a "cause of action for breach of contract accrues at the time of breach, which then starts the limitations period running. [Citation.]" (*Cochran v. Cochran* (1997) 56 Cal.App.4th 1115, 1120.) "[A] contract may be breached by nonperformance, by repudiation, or a combination of the two. [Citation.]" (*Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 514, fn. omitted.) A demurrer may be sustained based on the statute of limitations if " ' "the defect . . . clearly and affirmatively appear[s] on the face of the complaint; it is not enough that the complaint shows that the action may be barred. [Citation.]" [Citation.]' [Citation.]" (*Committee for Green Foothills*, *supra*, 48 Cal.4th at p. 42.)

In this case, the trial court found that the contract claims against defendants were time-barred in the absence of sufficient allegations that defendants agreed to delay transfer of the shares. In the absence of such a delayed transfer provision, the court determined that the alleged contract was ambiguous regarding the timing of the transfer of shares. Under these circumstances, the court reasoned that the shares were to be transferred upon completion of plaintiff's UI services "in December 2011 or shortly after" based on Civil Code section 1657 [if no time is specified for performance, performance must be immediately or within a reasonable time]. The court determined that the statute of limitations began to run for the failure to transfer the shares after expiration of a "reasonable time." As the transfer of shares could have occurred in December 2011 or shortly

---

employer was void under Business and Professions Code section 16600." (*Id.* at p. 466.) At pages 472 to 473 (the pages cite by plaintiff in the instant case), the appellate court in *Techno Lite* discussed noncompete agreements and employees competing with their employers.

23

thereafter, and as plaintiff's original complaint was filed in 2022, and in view of the four-year limitations period for a breach of contract claim, the court concluded that plaintiff's "claims for breach of contract that reasonably occurred 10 years ago are time barred."

On appeal, plaintiff contends that "what constitutes a 'reasonable time' for performance depends on the contract's nature and the partes' expectations." Plaintiff argues that "equity compensation is often contingent on liquidity events such as IPOs," that there is an "industry norm of waiting for an IPO," and that therefore "a longer performance period is justifiable." As we have explained, however, plaintiff's allegations are insufficient as presently pleaded to imply a delayed transfer provision in this case based on industry norms.

Plaintiff also contends that his breach of contract claim was not time-barred based on various legal doctrines. We are not persuaded by plaintiff's arguments.

First, plaintiff contends that under the delayed discovery rule, he first became aware of Yuan's refusal to transfer the shares in October 2019, "thus triggering the statute of limitations at that point." "Under the 'delayed discovery rule,' . . . the accrual date of a cause of action is delayed until the plaintiff is aware of his or her injury and its cause. The plaintiff is charged with this awareness as of the date he or she suspects or should suspect that the injury was caused by someone's wrongful act. The period of limitations, therefore, will begin to run when the plaintiff has a 'suspicion of wrongdoing'; in other words, when he or she has notice of information of circumstances to put a reasonable person on inquiry. [Citation.]" (*Brandon G. v. Gray* (2003) 111 Cal.App.4th 29, 35 (*Brandon G.*).) In the context of a breach of contract claim, a party "is well aware the contract has been breached when the date for delivery arrives and he has not received his widgets" or the time for payment "passes without receipt of the amount due." (*April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 831.)

In this case, as we have explained, plaintiff failed to allege sufficient facts establishing that defendants agreed to hold the shares until after an IPO. Under these circumstances, by at least the end of June 2012, when no shares were transferred to him at

24

the conclusion of the agreed-upon consultancy term, if not earlier when Yuan apparently terminated the arrangement in December 2011, and with no explanation from defendants to suggest that the shares would be transferred anytime soon, plaintiff had "notice of information of circumstances to put a reasonable person on inquiry." (*Brandon G.*, *supra*, 111 Cal.App.4th at p. 35.) A reasonable person would have asked defendants about the stock in December 2011, or at least by the end of June 2012. At that point, plaintiff would have learned that defendants did not intend to transfer any stock. As the statute of limitations appears to have commenced by 2012 based on the allegations in the second amended complaint, plaintiff's filing of the initial complaint approximately 10 years later in 2022, was untimely.

Second, plaintiff argues that the statute of limitations did not run until a later point in time due to the existence of a fiduciary relationship between the parties. As we explain *infra* in connection with the demurrer to plaintiff's breach of fiduciary duty causes of action, plaintiff has not alleged sufficient facts to establish a fiduciary relationship.

Third, plaintiff contends that equitable tolling applies in this case. In support of this argument, plaintiff cites *Addison v. State of California* (1978) 21 Cal.3d 313. Without providing a pinpoint citation, plaintiff states, "In *Addison*, equitable tolling was applied due to ongoing negotiations and assurances." Plaintiff's description of *Addison* is not accurate. The California Supreme Court in *Addison* applied equitable tolling to "conclude that the filing of an action in the United States District Court suspends the running of the six-month limitations period [citation] within which suits must be brought against public entities in state courts." (*Id.* at p. 315.) The California Supreme Court applied the doctrine of equitable tolling after determining there was "timely notice, and lack of prejudice, to the defendant[s], and reasonable and good faith conduct on the part of the plaintiff[s]." (*Id.* at p. 319.) Application of equitable tolling in *Addison* was not based on any ongoing negotiations or assurances by one party to another.

25

Fourth, plaintiff argues that the statute of limitations did not commence until 2019 when Yuan explicitly refused to transfer the shares. Plaintiff contends that prior to that time, "[d]efendants' discussions with [him] regarding Zoom's progress toward IPO assured him that his shares remained in trust with the [d]efendants." According to plaintiff, these assurances "constituted a new promise and agreement that renewed the limitation periods." However, plaintiff does not identify any allegation indicating that Yuan's post-agreement communications about progress toward an IPO also included a statement that could reasonably be interpreted as an assurance that shares were remaining in trust until an IPO.

Fifth, plaintiff contends that "delays induced by a defendant's conduct prevents them from using the statute of limitations defense [citations]." Plaintiff does not persuasively articulate how the allegations in the second amended complaint fall within this rule or otherwise articulate how the facts alleged in the second amended complaint are analogous to any of the cases that he cites.

Sixth, plaintiff argues in a single sentence that where "one party has performed, the contract is unilateral and without an expiration date, the statute does not begin to run as long as the promisee relies on the contract [citation]." Plaintiff does not explain how the authority he cites supports this argument, nor does he persuasively articulate how the facts alleged in his second amended complaint fall within this purported legal principle.

We are also not persuaded by plaintiff's reliance on the trial court's ruling on the demurrer to the prior (first amended) complaint. According to plaintiff, the trial court was inconsistent in its analysis on the demurrers to the first and second amended complaints regarding whether his claims were time-barred. To the extent plaintiff is relying on the trial court's *tentative ruling* on the demurrer to the first amended complaint, we are not persuaded by his argument. "Tentative rulings 'indicate the way the judge is prepared to decide the matter based on the information before him or her when the ruling was prepared.' [Citation.]" (*Brown, Winfield & Canzoneri, Inc. v. Superior Court* (2010) 47 Cal.4th 1233, 1245.) "Courts are not bound by their tentative rulings. [Citation.]" (*Jespersen v. Zubiate-*

26

*Beauchamp* (2003) 114 Cal.App.4th 624, 633.) " 'A court may change its ruling until such time as the ruling is reduced to writing and becomes the [final] order of the court.' [Citation.]" (*Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 300.) Thus, a "trial court's tentative ruling is not binding on the court," and "the court's final order supersedes the tentative ruling. [Citations.]" (*Ibid.*)

In this case, in the trial court's final written order regarding the demurrer to the first amended complaint, the court determined that plaintiff failed to allege sufficient facts to state a cause of action, including regarding the existence of a contract requiring the delayed transfer of shares. The court also indicated that although there was a possibility that the breach of contract and other causes of action were time-barred, the mere possibility of being time-barred was not a sufficient basis upon which to sustain a demurrer. The court stated that plaintiff was being given leave to amend and that defendants could raise the statute of limitations again if warranted by the allegations of a further amended pleading.

On appeal, plaintiff contends that the subsequent, second amended complaint contained "no substantive changes in the underlying facts." We do not agree. The second amended complaint contained numerous additional allegations from which the trial court was required to determine anew, based upon another round of demurrers by defendants, whether any claims were time-barred. The record thus does not reflect any "inconsistency" in the trial court's rulings between the first and second amended complaints.

In sum, we determine that the trial court properly sustained the demurrers to the breach of contract claims for failure to state sufficient facts regarding the existence of a contract providing for the delayed transfer of shares and regarding the claims being time-barred in the absence of a delayed transfer provision. However, as we have explained, plaintiff should be granted leave to amend as to this cause of action.

## C. *Breach of Fiduciary Duty*

In sustaining defendants' demurrer to the breach of fiduciary duty causes of action, the trial court determined that plaintiff failed to sufficiently allege a fiduciary relationship

between the parties.  On appeal, plaintiff contends that a fiduciary relationship existed because (1) Yuan elicited a "high degree of trust and confidence" from plaintiff, (2) plaintiff "was entitled to all the rights and privileges of a Zoom shareholder" upon performing the UI services, and (3) Yuan promoted a stock offering to plaintiff as a prospective investor.

" '[B]efore a person can be charged with a fiduciary obligation, he must either knowingly undertake to act on behalf and for the benefit of another, or must enter into a relationship which imposes that undertaking as a matter of law.'  [Citation.]"  (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 386 (*City of Hope*).)  Examples of relationships that impose a fiduciary obligation include a joint venture, partnership, or agency.  (*Ibid.*)

In *City of Hope*, the California Supreme Court rejected the argument that the presence of the following four characteristics necessarily gives rise to a fiduciary relationship:  "(1) one party entrusts its affairs, interests or property to another; (2) there is a grant of broad discretion to another, generally because of a disparity in expertise or knowledge; (3) the two parties have an 'asymmetrical access to information,' meaning one party has little ability to monitor the other and must rely on the truth of the other party's representations; and (4) one party is vulnerable and dependent upon the other."  (*City of Hope*, *supra*, 43 Cal.4th at pp. 387-388.)  The court explained that these "four characteristics . . . are common in many a contractual arrangement, yet do not necessarily give rise to a fiduciary relationship."  (*Id.* at p. 388.)  As an example, the court observed that "a person who takes a car to a garage for repairs has entrusted property to another," but "no court has ever held or suggested . . . that in this situation the garage operator owes fiduciary duties to the car owner."  (*Id.* at pp. 388-389.)  The court explained that it was "not at all unusual for a party to enter into a contract for the very purpose of obtaining the superior knowledge or expertise of the other party.  Standing alone, that circumstance would not necessarily create fiduciary obligations, which generally come into play when one party's vulnerability is so substantial as to give rise to equitable concerns underlying the protection

afforded by the law governing fiduciaries. [Citations.]" (*Id.* at p. 389.) Similarly, regarding reposing trust and confidence, the court observed that " '[e]very contract requires one party to repose an element of trust and confidence in the other to perform.' [Citations.] And one party's 'ability to exploit a disparity of bargaining power' between the parties does not necessarily create a fiduciary relationship. [Citation.]" (*Ibid.*) Further, "mere receipt of confidential information does not create [a] fiduciary duty." (*Id.* at p. 392.)

In this case, "[t]here is no indication in the [alleged] contract that [defendant Yuan or defendant Zoom] entered into it with the view of acting primarily for the benefit of [plaintiff]." (*City of Hope*, *supra*, 43 Cal.4th at p. 386.) Instead, the alleged "contract envision[ed] a mutually beneficial relationship between the parties," with plaintiff providing UI services and defendants providing shares of stock. (*Ibid.*) "[N]othing in the [alleged] contract indicates that [defendants were] to subordinate [their] interests to those of [plaintiff] . . . ." (*Ibid.*) Moreover, the high degree of trust and confidence that Yuan allegedly sought from plaintiff—even before they entered the alleged contract—was insufficient to establish a fiduciary relationship. (See *id.* at pp. 388-389.)

Plaintiff contends that a fiduciary relationship was created upon his performance of the UI services. According to plaintiff, at that point, he "was entitled to all the rights and privileges of a Zoom shareholder," including the fiduciary relationships that Zoom's agents, officers, and directors have with Zoom shareholders. We are not persuaded by plaintiff's argument that he was owed a fiduciary duty as a Zoom shareholder. Based on the allegations of the second amended complaint, no shares were transferred to him. As a result, he never became a shareholder.

Plaintiff's reliance on *Cleveland v. Johnson* (2012) 209 Cal.App.4th 1315 (*Cleveland*) does not advance his argument. Plaintiff incorrectly describes *Cleveland* as involving a plaintiff who "had not received the shares he was owed." Instead, the plaintiff in *Cleveland* was an "investor" who "provided the seed money for [a] corporation, and in return he was to share in the net cash receipts and later in the gross profits of the enterprise,

29

if there were any." (*Id.* at pp. 1342-1343.) The appellate court determined that the promoter, who had induced the investment, owed a fiduciary duty to the plaintiff as an investor. (*Id.* at pp. 1319-1320, 1325, 1342.) The appellate court observed that "the arrangements with [the plaintiff] were very much in the nature of a limited partnership (where the limited partner provides capital but does not take part in running the enterprise), a relationship which as a matter of law gives rise to fiduciary duties on the part of those managing the enterprise. [Citation.]" (*Id.* at pp. 1343-1344.) Thus, whereas the "arrangement[]" in *Cleveland* was "in the nature of a limited partnership," which "as a matter of law [gave] rise to fiduciary duties" (*id.* at pp. 1343-1344), no such arrangement was alleged by plaintiff in the instant case.

Regarding a promoter's fiduciary duty, as the trial court observed in the present case, plaintiff did not allege facts to support the theory that Yuan acted as a promoter of a stock offering to plaintiff as a prospective investor. Instead, in the second amended complaint, plaintiff repeatedly alleged that Yuan "solicited" him for UI services. Yuan wanted plaintiff to "start" as a consultant and to later join permanently, apparently as an employee. Plaintiff alleged that he "wasn't interested in earning a modest fee for his UI [s]ervices" and instead wanted stock with a delayed transfer of the shares. To that end, plaintiff alleged that he himself "proposed that he be paid 20,000 shares of Zoom [s]tock, 'no cash,' in exchange for his UI [s]ervices." (See *Nelson v. Abraham* (1947) 29 Cal.2d 745, 750 [distinguishing a profit sharing agreement that "is merely to provide a measure of compensation for services," with one that "extends beyond and bestows ownership and interest in the profits themselves so as to constitute the undertaking a partnership or a joint venture," the latter of which is a relationship "of a fiduciary character"].)

Plaintiff generally contends that "any perceived defects" in his pleading can be "remedied through amendment." Regarding the breach of fiduciary duty claim, plaintiff states that he "can expand on the professional history between himself and Mr. Yuan, focusing on their collaborative successes and the mutual trust that developed from these

30

interactions. This expansion would include specific projects they worked on together, illustrating the reliance and confidence Plaintiff placed in Mr. Yuan's commitments." Plaintiff also states that he can "further detail how Mr. Yuan (as a Zoom agent, director, and CEO) had a fiduciary relationship with [plaintiff] as a beneficiary shareholder once he performed. This would address any concerns about the existence and scope of the fiduciary relationship."

Although plaintiff states that he can add allegations in these respects, he does not persuasively articulate how such allegations would establish a fiduciary relationship under the relevant legal principles. Accordingly, we determine that the trial court properly sustained the demurrer to the breach of fiduciary duty claim without leave to amend. (See *Schifando*, *supra*, 31 Cal.4th at p. 1081.) Having determined that plaintiff failed to allege sufficient facts regarding the existence of a fiduciary relationship, we need not decide whether the breach of fiduciary duty causes of action were barred by the statute of limitations.

### D. *Fraud*

In the causes of action for fraud based on a false promise against Yuan and Zoom, plaintiff alleged that Yuan falsely promised to transfer Zoom stock when he stated, "20,000 shares is OK" and "20,000 is not a small amount."

In their demurrer, defendants contended that plaintiff (1) failed to identify a fraudulent statement by Yuan that shares would be held for plaintiff until an IPO or liquidity event, and (2) failed to allege that Yuan held the requisite fraudulent intent.

In sustaining defendant's demurrer for failure to state sufficient facts, the trial court determined that Yuan did not make an unconditional promise to give plaintiff 20,000 shares. Rather, the offer of 20,000 shares was on the condition that plaintiff remain available as a consultant for one year. The court further determined that plaintiff failed to allege a statement by Yuan indicating that he intended to hold the Zoom shares for plaintiff until after a liquidity event.

On appeal, plaintiff contends that Yuan promised in the October 28, 2011 e-mail to transfer 20,000 shares to plaintiff.  According to plaintiff, this promise was made without an intent to perform.[5]

" 'The elements of fraud, which give rise to the tort action for deceit, are (a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage.' [Citations.]" (*Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638 (*Lazar*).)  " 'Promissory fraud' is a subspecies of the action for fraud and deceit.  A promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud.  [Citations.]  [¶]  An action for promissory fraud may lie where a defendant fraudulently induces the plaintiff to enter into a contract.  (*Chelini v. Nieri* (1948) 32 Cal.2d 480, 487 ['tort of deceit' adequately pled where plaintiff alleges 'defendant intended to and did induce plaintiff to employ him by making promises . . . he did not intend to (since he knew he could not) perform' (fn. omitted)] . . . .)  In such cases, the plaintiff's claim does not depend upon whether the defendant's promise is ultimately enforceable as a contract.  'If it is enforceable, the [plaintiff] . . . has a cause of action in tort as an alternative at least, and perhaps in some instances in addition to his cause of action on the contract.' [Citations.]" (*Lazar*, *supra*, 12 Cal.4th at p. 638.)

Consequently, one of the elements of promissory fraud is "the intent not to perform at the time the promise was made." (*Behnke v. State Farm General Ins. Co.* (2011) 196 Cal.App.4th 1443, 1453 [explaining that the elements of promissory fraud include,

---

[5] In his opening brief on appeal, plaintiff requests judicial notice of "findings" from a separate federal case apparently involving Zoom.  We deny his request.  Plaintiff has not complied with the requirements of the California Rules of Court for seeking judicial notice in this court, and he has not demonstrated that the findings in the federal case are the proper subjects of judicial notice.  (See Cal. Rules of Court, rule 8.252; *LG Chem, Ltd. v. Superior Court* (2022) 80 Cal.App.5th 348, 362, fn. 7 [explaining that " ' "[t]aking judicial notice of a document is not the same as accepting the truth of its contents" ' "].)

among others, "(1) a promise made regarding a material fact without any intention of performing it; (2) the existence of the intent not to perform at the time the promise was made; [and] (3) intent to deceive or induce the promisee to enter into a transaction"].)  In establishing the intent not to perform, "[i]t is insufficient to show an unkept but honest promise, or mere subsequent failure of performance.  [Citation.]  ' "[S]omething more than nonperformance is required to prove the defendant's intent not to perform his promise."  [Citations.]  To be sure, fraudulent intent must often be established by circumstantial evidence. . . .  However, if [a] plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an oral promise, he will never reach a jury.'  [Citation.]"  (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1183 (*Riverisland Cold Storage*).)

"In California, fraud must be pled specifically; general and conclusory allegations do not suffice.  [Citations.]  'Thus " 'the policy of liberal construction of the pleadings . . . will not ordinarily be invoked to sustain a pleading defective in any material respect.' "  [Citation.]  [¶]  This particularity requirement necessitates pleading *facts* which "show how, when, where, to whom, and by what means the representations were tendered." '  [Citation.]"  (*Lazar*, *supra*, 12 Cal.4th at p. 645.)

As we have explained in the context of the breach of contract claim, the parties' e-mails may reasonably be viewed as the parties reaching an agreement for plaintiff to provide UI services until June 2012 with compensation in the form of 20,000 Zoom shares.  During these communications, Yuan expressly stated, "20,000 shares is OK . . . ."  Although he also included a "request" that plaintiff remain in a "consultant role" for one year until October 2012, plaintiff countered with a consultancy ending in June 2012.  Yuan's subsequent response of acceptance gives rise to a reasonable inference that both understood that they had reached an agreement regarding plaintiff providing UI services until June 2012, with compensation of 20,000 shares.  Indeed, it is reasonable to infer that neither party at the conclusion of the e-mails thought plaintiff was going to provide approximately eight months

of consulting services for free.  Thus, Yuan's statement that "20,000 shares is OK" may reasonably be interpreted as a promise by Yuan to compensate plaintiff for his UI services with that specific amount of shares.

We also determine that plaintiff has sufficiently alleged with particularity the facts giving rise to the requisite fraudulent intent, including Yuan's alleged intent not to perform at the time the promise was made.  " ' "[F]raudulent intent must often be established by circumstantial evidence." ' " (*Riverisland Cold Storage*, *supra*, 55 Cal.4th at p. 1183.)  In this case, although Yuan initially requested a one-year consulting term and ultimately settled on an approximately eight-month term, he terminated the contract relatively quickly after only one or two months, indicating that a full-time employee in another country had been hired to replace plaintiff.  Although Yuan at the time of the termination in 2011 characterized the "help" provided by plaintiff as "wonderful" and "greatly appreciated," Yuan later indicated in 2019 that the services provided by plaintiff did "not fit well" when plaintiff asked about the shares he was owed.  At that point in 2019, after being reminded by plaintiff about an agreement for stock with an eight-month consulting term, Yuan denied that stock could be granted "without signing 12 months advisor work."  Based on these allegations, a reasonable inference could arise that Yuan had a fraudulent intent at the time of the original agreement in 2011, in view of Yuan's termination of a months-long contract after only a few weeks, a replacement for plaintiff already being hired in another country, Yuan's seemingly inconsistent characterizations about the usefulness of plaintiff's services, and Yuan's later denial that any such contract could have existed without violating company policy.

Defendants contend that plaintiff's allegations were insufficient.  In the trial court, for example, defendants contended that Yuan's statement in 2019 about stock grants being subject to a 12-month work agreement was in reference to the company's current 2019 policy, not a reference to any prior policy in 2011, when the alleged agreement was made with plaintiff for stock and a shorter consulting term.

34

This is not the only possible interpretation, however. Another reasonable interpretation, and as alleged by plaintiff, is that Yuan "formed a fraudulent intent to induce" plaintiff to enter the shares-for-services agreement in 2011, and "concealed the fact that Zoom policy" at the time required a 12-month term to receive stock. Plaintiff alleged that in 2011, "Yuan never intended to transfer" the stock and "planned to knowingly hide behind the Zoom twelve (12) month policy to deny the obligation to transfer" the stock to plaintiff. On demurrer, we must "draw[] all reasonable inferences in favor of [plaintiff's] allegations." (*Harris*, *supra*, 52 Cal.3d at p. 1170, fn. 16; see also *Miyahara*, *supra*, 99 Cal.App.5th at p. 703 [explaining that factual questions may not be resolved on demurrer].) Combined with the additional allegations of Yuan's termination of the contract after only a few weeks, the hiring of plaintiff's replacement in another country, and Yuan's seemingly inconsistent evaluations of plaintiff's services, we determine that sufficient facts regarding fraudulent intent were alleged to withstand demurrer.

However, plaintiff fails to allege sufficient facts establishing that his fraud claim was timely filed. A fraud claim is subject to a three-year statute of limitations. (Code Civ. Proc., § 338, subd. (d).) "Generally speaking, a cause of action accrues at 'the time when the cause of action is complete with all of its elements.' [Citations.]" (*Fox v. Ethicon Endo-Surgery, Inc*. (2005) 35 Cal.4th 797, 806-807.)

Code of Civil Procedure section 338, subdivision (d) provides that a fraud claim "is not deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud . . . ." " 'Literally interpreted, this language would give the plaintiff an unlimited period to sue if [the plaintiff] could establish ignorance of the facts. But the courts have read into the statute a duty to exercise diligence to discover the facts." (*Parsons v. Tickner* (1995) 31 Cal.App.4th 1513, 1525 (*Parsons*).) Specifically, "[t]he courts interpret discovery in this context to mean not when the plaintiff became aware of the specific wrong alleged, but when the plaintiff suspected or should have suspected that an injury was caused by wrongdoing. The statute of limitations begins to run when the plaintiff

has information which would put a reasonable person on inquiry. A plaintiff need not be aware of the specific facts necessary to establish a claim since they can be developed in pretrial discovery. Wrong and wrongdoing in this context are understood in their lay and not legal senses. [Citation.]" (*Kline v. Turner* (2001) 87 Cal.App.4th 1369, 1374 (*Kline*).)

Consequently, "[t]he rule is that the plaintiff must *plead and prove the facts* showing: (a) Lack of knowledge. (b) Lack of means of obtaining knowledge (in the exercise of reasonable diligence the facts could not have been discovered at an earlier date). (c) How and when [the plaintiff] did actually discover the fraud or mistake. Under this rule constructive and presumed notice or knowledge are equivalent to knowledge. So, when the plaintiff has notice or information of circumstances to put a reasonable person on inquiry, or has the opportunity to obtain knowledge from sources open to [the plaintiff's] investigation . . . , the statute commences to run.' [Citation.]" (*Parsons*, *supra*, 31 Cal.App.4th at p. 1525.)

In this case, as we have explained, plaintiff sufficiently alleged facts regarding an agreement to provide UI services until June 2012, in return for compensation of 20,000 shares of Zoom stock. However, plaintiff did not allege sufficient facts establishing that defendants agreed to hold the shares until after an IPO. Under these circumstances, by at least the end of June 2012, when no shares were transferred to him at the conclusion of the agreed-upon term, if not earlier when Yuan apparently terminated the arrangement in December 2011, and with no explanation from defendants to suggest that the shares would be transferred anytime soon, plaintiff had "information which would put a reasonable person on inquiry." (*Kline*, *supra*, 87 Cal.App.4th at p. 1374.) Plaintiff could have asked Yuan about the stock in December 2011, or at least by the end of June 2012. There is nothing to suggest that Yuan would not have made the same disclosures at that point in 2012, as he did when plaintiff eventually did inquire in 2019, that is, no shares would be transferred to plaintiff. Further, as we have explained regarding plaintiff's breach of contract causes of action, plaintiff fails to persuasively articulate any other legal basis upon which it may be

concluded that the statute of limitations did not commence or was otherwise tolled until 2019. As the statute of limitations appears to have commenced by 2012 based on the allegations in the second amended complaint, plaintiff's filing of the initial complaint approximately 10 years later in 2022 was untimely.

We have already determined that plaintiff should be granted leave to amend the breach of contract cause of action regarding possible additional allegations that would support a reasonable inference that the mutual intent of the parties at the time of contracting was a post-IPO transfer of shares. Depending on those allegations, plaintiff might be able to establish that his fraud claim was timely. We therefore determine that plaintiff should be granted leave to amend the fraud claim.

In sum, although the demurrer was properly sustained as to the fraud causes of action as presently pleaded, plaintiff should be granted leave to amend this cause of action.

### E. *Proposed Additional Causes of Action Based on "Alternative Legal Theories"*

Plaintiff contends that there are additional causes of action that he can allege based an alternative legal theories. However, plaintiff does not persuasively articulate, with relevant legal authority, how a viable cause of action can be stated under any of these other theories.

### F. *Due Process*

Plaintiff contends that the "cumulative effect of [certain] procedural deficiencies [in the trial court] constitutes a structural error that violates due process, warranting reversal." According to plaintiff, the "procedural issues" include the trial court's "misinterpretation of the facts" alleged in the second amended complaint, "inappropriate determination of fact at the demurrer stage," and "misinterpretation of the arguments presented" by plaintiff's counsel at the hearing on the demurrer. Plaintiff also argues that he was not given an "adequate opportunity" at the demurrer hearing to articulate his argument about the delayed

timing clause, and that the trial court's "refusal to allow a supplemental brief to address potential amendments illustrates a further denial of due process."

We do not find plaintiff's argument persuasive. First, he fails to cite relevant legal authority to support his argument that structural error, resulting in a violation of due process and warranting reversal, may occur in connection with a demurrer, and that such error occurred in this case.

Second, on appeal regarding an order sustaining a demurrer, " 'we examine the complaint de novo to determine whether it alleges facts sufficient to state a cause of action . . . .' " (*Committee for Green Foothills*, *supra*, 48 Cal.4th at p. 42.) "In deciding whether a demurrer was properly sustained, '[w]e are not bound by the trial court's stated reasons, if any, supporting its ruling; we review the ruling, not its rationale.' [Citation.]" (*Center for Environmental Health v. Perrigo Co.* (2023) 89 Cal.App.5th 1, 16.) In other words, in conducting our de novo review, plaintiff is not affected by, for example, any purported misinterpretation of the pleading by the trial court.

Third, the record reflects that at the demurrer hearing, the trial court provided plaintiff with ample opportunity to present his argument both before and after the court heard argument from defendants. The court ultimately concluded the hearing after observing "[w]e're going in circles," and plaintiff's counsel thereupon started "shout[ing] at the Court." Plaintiff fails to persuasively demonstrate with legal authority that due process principles required the court to entertain further argument from him under these circumstances.

Lastly, the record reflects that at the conclusion of the hearing, plaintiff asked, "Will the Court indulge a sur-opposition, a supplemental opposition?" The trial court responded, "It's not necessary. It isn't." Plaintiff stated, "With additional facts." The court then stated, "You've had a chance to allege those facts. You've confirmed for me multiple times that the e-mails are the contract. The e-mails are all in the record. So the time for any additional facts was when you prepared the SAC, and they're not there."

On appeal, plaintiff fails to provide legal authority demonstrating that the trial court erred in refusing to allow him to file a "sur-opposition" or "supplemental opposition" after the hearing on the demurrer. Moreover, plaintiff has had the opportunity on appeal to argue that an amendment would cure any defect in the pleading. (See *Schifando*, *supra*, 31 Cal.4th at p. 1081; *Las Lomas Land*, *supra*, 177 Cal.App.4th at p. 861.)

In sum, we determine that plaintiff fails to demonstrate a violation of due process.

### III.    DISPOSITION

The judgment in favor of defendants Zoom Video Communications, Inc. and Eric Yuan is reversed. The trial court is directed (1) to vacate the order sustaining defendants' demurrer without leave to amend and (2) to enter a new order (a) sustaining the demurrer *with* leave to amend as to the first, second, fifth, and sixth causes of action for breach of contract and fraud, and (b) sustaining the demurrer *without* leave to amend as to the third and fourth causes of action for breach of fiduciary duty. The parties shall bear their own costs on appeal.

_____
                    Greenwood, P. J.


WE CONCUR:


_____
 Grover, J.


_____
 Kulkarni, J.*


H052030 Yu v. Zoom Video Communications, Inc. et al.

_____
      * Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.